**STATE of Missouri,
Plaintiff-Respondent,**

v.

**David Alan HOWARD,
Defendant-Appellant.**

No. 13235.

Missouri Court of Appeals,
Southern District,
Division One.

March 9, 1984.

Motion for Rehearing or to Transfer to Supreme Court Denied April 2, 1984.

Application to Transfer Denied
May 15, 1984.

John D. Ashcroft, Atty. Gen., Frank A. Rubin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

David Robards, Joplin, for defendant-appellant.

GREENE, Chief Judge.

Defendant, David Alan Howard, was jury-tried and convicted of one count of first degree assault, one count of second degree assault, and two counts of third degree assault, for which he received total sentences of 27 years' imprisonment and $2,000 in fines.

The charges against Howard were filed after a high-speed automobile chase on Interstate 44 near Rolla, Missouri. Howard, who had been observed driving his Datsun automobile in excess of the speed limit, tried to elude pursuing highway patrolmen by outrunning them.

During the chase, patrol cars driven by Troopers Quinn and Kernick were struck by the Datsun driven by Howard, and Trooper J.T. Roberts, on foot at the time, was forced to jump from the path of Howard's car to avoid being hit. Howard was finally apprehended, after ramming Quinn's patrol car at a roadblock. The only person apparently injured during the incident, which resembled a demolition derby in many respects, was Howard. His facial injuries, consisting of cuts requiring 16 or more stitches to close, were attributed by Howard to a beating he said he received from patrol officers after he was arrested.

Howard relies on nine points of claimed trial error in this appeal, several of which are meritorious.

Howard's point two contends that the trial court committed prejudicial error by forcing defendant to trial without conducting a hearing to determine his competency. The criminal charges in question were filed on August 3, 1981. Howard's counsel gave notice that Howard would rely on the defense of mental disease or defect excluding responsibility. The trial judge ordered a mental examination which was conducted at the Nevada State Hospital on February 2, 1982. The reports of Paul L. Barone, M.D., Medical Director III of that facility, and William Amos, Ed.D., a clinical psychologist at the hospital, diagnosed Howard as cyclothymic, which is an insecure person who attempts to over-compensate for his deficiencies when under stress, and that Howard displayed a very positive attitude about his own ability to prove his innocence of the charges against him without the aid of an attorney.

However, although Howard took the position that he was competent and could conduct his own defense, his behavior, subsequent to the filings of the reports of Drs. Barone and Amos suggested otherwise. Examples of Howard's bizarre behavior were:

1. At a hearing on the state's motion to exclude from the trial any reference to a polygraph examination taken by the defendant, which motion was sustained by the trial court, the defendant defiantly announced to the court:

"I will use the lie detector in court ... [y]ou well know I took a lie detector, and passed it, that said I didn't do any of these acts.... This is harassment from the court and delay of trial. Two years, it's been. Now you can't do anything to me. So dismiss it all ... I'm a helluva man, and I've been done wrong. Beat by the patrol, and I've sued them myself in federal court.... I'll crucify them. I'm a helluva man.... Dismiss all the charges right now, ... or I'll take sodium pentothol and you can dismiss them after I've been questioned. Now get yourself out of this one ... Okay. My bag's packed. They'll interview me

through my cell. 'Sixty Minutes,' films watching everything. So do as you please. I'm a helluva man ... I will use the lie detector ... They'll build a statue of me in Washington, D.C. ..."

2. In a letter dated May 22, 1982, written to the trial judge, defendant alleged he had been "driven by the power of Satan and greed.... I was seeking revenge and that is so very wrong 'please' help me I'm a good man."

3. An undated letter written to the trial judge read as follows: "Ole Pal, Ole Buddy, Ole Judgey Poo; Please give ole Davey just a teeney weeney [B]reak and let me go home to my 'Mommy and Daddy.' Your Ole Buddy ... Dave"

4. Another letter addressed to Judges Northern and Moore stated that the reason Howard was driving foolishly was because the state mafia was trying to steal his father's business, and that he and his ex-wife were having trouble. It also stated, "Now, after your best shot you lost. Either dismiss all charges against me and return my license and bond money or try some more of your shitty State tricks. I listen to no one except the FBI, so don't waste your time talking with my parents. If you still aren't finished harassing me yet then send me to Jefferson City to the State Pen because I won't be back anywhere for any trial or go anywhere for any exam. They didn't teach you in law school how to lie your way around a polygraph and by the way the FBI uses them to eliminate suspects (show this to the press ... baby)."

Howard developed a delusional fixation that the highway patrol, prosecutor, and the judge had formed a conspiracy to frame him on the charges, and that because he had evidently taken and passed a polygraph examination showing that he had not intended to injure any of the highway patrolmen during the automobile chase, that he should be released and the charges against him dismissed.

Two successive hired attorneys withdrew as counsel for Howard, and the public defender was appointed to represent him. Howard refused to cooperate with the pub-

lic defender, or the court, would not show up in court for hearings, after being ordered to do so, and insisted on his polygraph examination record being admitted as evidence in his behalf. This conduct earned him two contempt of court sentences, one for 30 days and the other for one year.

The case was not tried until September 21, 1982. On that date, the public defender requested that the trial court hold a hearing to determine the competency of Howard to stand trial, and in support of the motion made the following offer of proof:

"MR. STERLING: Your Honor, I would intend ... to make a motion for a further examination as to the defendant's competence to proceed. My personal contacts telephonically with the defendant over the past several days has indicated to me that he is totally irrational with respect to his behavior and attitudes in the context of this case, and that if allowed to put him on the stand, that he would ... demonstrate that type of behavior and those type of attitudes which have made him impossible to counsel or to advise, or for me to act as his attorney. On the basis of the evidence adduced through that, calling that witness, I would ask the Court to either order further psychiatric evaluation as to his competence to proceed, or I would ask the Court to find that he has repudiated the Court's offer of appointed counsel, and has in effect insisted that he either go counselless or represent himself in the context of the proceeding and permit me to withdraw. In the context of this offer of proof, I would offer to prove that he is—with respect to me, has refused to discuss the case with me unless I go to the F.B.I. office in Rolla, Missouri, and submit to a polygraph examination. I would offer to prove that he is—when I tried to call, talk to his father to discuss his behavior with his father, Earl Howard, that he has answered the phone and refused to let me talk to the father, because I had not contacted the F.B.I. He has accused me of a

conspiracy, of participation in conspiracy with the Court and counsel in respect to this case and that's the apparent reason for requesting me to go to the F.B.I. office, and told me I could clear myself my [sic] confessing to the F.B.I.

He has demonstrated a total irrational reliance on the possibility that a polygraph examination that he at one point took in the processing of this case is somehow going to be used in evidence and would permit ... him to vindicate himself in the eyes of the jury.

He has announced to me that he will get a change of venue to Jasper or Newton Counties and that they have to grant him a change of venue, as well; that he cannot be tried by judges of this particular county; and that's again because of a conspiracy.

He's announced that he is probably going to be a hero because of his efforts in order to make polygraphs admissible in the courts of this nation and that he, in all seriousness, believes that he is going to be elected as the new head of the F.B.I.

He's at one time announced to me that he'll probably be represented in the context of this case by William Webster, the Director of the F.B.I.

He has sent my office—and I think several other persons involved in the case—copies of bumper stickers that he's had printed up, and apparently at his own expense, and distributed with respect to the issue that exists in his mind with respect to polygraph examination ....

I would offer to prove to the Court that rather than it being a situation where he has simply sought to maneuver the Court to his own convenience because he's out on bond, he has in fact become so obsessed and irrational with respect to this pending litigation that he has threatened and alienated various friends of his which had previously offered their support on his behalf ... [and] has sent ... semi-threatening letters indicating that [they] must go to the F.B.I. office ... and submit to a polygraph examination, because he had heard that I had called [them] to seek [their] possible assistance as ... character witness[es].

I would offer to show to this Court that defendant has written numerous letters to the prosecuting attorney in which he has exhibited irrational and bizarre ideas with respect to the law as it pertains to this case....

And in summary, I believe that through this witness ... the Court could be convinced that his behavior is so irrational that he has lost his competence to proceed."

The motion was denied by the trial court.

The trial court allowed Howard to conduct his own defense at trial, with the public defender standing by as amicus curiae. Howard's self-proclaimed qualifications to represent himself were that he was a "good republican", and that he had watched Perry Mason on TV a few times. This state of affairs amounted to a trial in name only. Howard would not allow the public defender to question many of the state's witnesses. As an example, following the testimony of Trooper Ralph Roark, the trial judge asked Howard if he had any questions of the witness. This triggered the following testimony and series of events.

"THE DEFENDANT: I think he's honest, Your Honor. He's a good man. I have none.

MR. STERLING: I'd like to ask a few questions, if you would permit that.

THE DEFENDANT: No, he don't need to be questioned. He's fine. He told the truth. He's a good man. No further questions.

MR. STERLING: Without that— there's some additional information I'd like to get. Do you wish me to do that?

THE DEFENDANT: Don't need it. He's a good man. Tell him to step down.

MR. STERLING: Okay."

The state then rested.

Out of the jury's presence, the defendant announced he had no evidence. He

thought he did not need to testify because the trial judge was a "republican" and would be "fair." He had no other evidence he wanted to present. The court inquired as to whether he had been advised that extreme mental distress could be raised as a defense. The defendant guessed he had not but did not want to talk to the public defender about it; he was sure the court would be "fair." When informed the court was not going to testify for him, the defendant said, "Well, I'll tell my story, I guess. Might as well. Can't dance." The court thereupon suggested he discuss his testimony with the public defender but the defendant said he had nothing to discuss. The defendant replied, "It's just cut and dried. Let's go. I am ready." At the bench, the public defender indicated he would try to show the defendant's mental state after the Datsun was stopped and introduce evidence that the chase was as dangerous to the defendant as it was to others but the defendant did not want him to so proceed and announced that the defense was resting.

"THE COURT: Well, just a minute. Come back. Come back here. I'm going to permit your lawyer to do that for the simple reason that—

THE DEFENDANT: Your Honor,—

THE COURT: —*you have not demonstrated that you have a clear-thinking understanding of what this situation is.* (emphasis ours)

THE DEFENDANT: I'll tell the story. I'll be sworn in to say what happened, in detail.

THE COURT: We're talking about calling him [Roark] back. Whether you want it or not, the Court's gonna—gonna permit him to call him back in your behalf.

THE DEFENDANT: Okay.

THE COURT: It can't do anything but to help you.

THE DEFENDANT: I can clear up the situation real fast."

The court thereafter directed the public defender to recall Roark because the de-

fendant's decision *"is not wisely made, otherwise."* (emphasis ours.) Many other episodes of the similar nature appear in the record.

A person charged with a crime is not competent to stand trial if, as the result of mental disease or defect, he lacks capacity to understand the proceedings against him or to assist in his own defense. § 552.-020(1); [1] *Bryant v. State,* 563 S.W.2d 37, 41 (Mo. banc 1978). Missouri law requires an investigation of a defendant's mental state when the court has "reasonable cause to believe" incompetency exists. § 552.020(2).

■ In this case, the trial court's continuing opportunity to observe defendant and to gauge whether he was capable to represent himself with aid from the public defender when requested, should have alerted the court to the possible incapacity of defendant. The evidence in the record sustains a reasonable belief that defendant lacked the competence to stand trial. This being so, it was prejudicial error to proceed without holding a competency hearing to determine the issue. *State v. Moon,* 602 S.W.2d 828, 834–836 (Mo.App.1980).

■ We further observe that permitting Howard to pull the lead oar in his defense, with only token aid from the public defender in this hybrid representation case, was prejudicially erroneous, as there is no evidence in the record from which it could be found that Howard had the competence to call the shots in his defense, and further observe that the giving of Instruction No. 9 (verdict director on first degree assault on which charge Howard was found guilty and sentenced to 20 years' imprisonment) was erroneous, because the instruction did not include the paragraph: "Second, that the defendant did not act under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, as submitted in Instruction No. ___", and was, therefore, prejudicially erroneous, since there was substantial evidence introduced at trial that Howard was under the influence of ex-

---

**1.** Unless otherwise indicated, all references to statutes are to RSMo 1978, V.A.M.S.

treme emotional disturbance during the series of events in question. Notes on Use 5, MAI–CR2d 19.02; *State v. Nunn*, 646 S.W.2d 55, 56 (Mo. banc 1983).

The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

FLANIGAN, P.J., and TITUS, J., concur.

CROW, J., dissents and files dissenting opinion.

CROW, Judge, concurring in part and dissenting in part.

I concur in that portion of the majority opinion holding instruction 9 prejudicially erroneous. Accordingly, I would reverse that portion of the judgment in which appellant is adjudicated guilty of the class A felony of assault in the first degree by means of a dangerous instrument as charged in Count II of the information, and sentenced to 20 years' imprisonment therefor, and remand the cause for a new trial on Count II only.

I respectfully dissent in the reversal of that portion of the judgment in which appellant is adjudicated guilty of, and sentenced for, the offenses charged in Counts I, III and IV.

Appellant's bizarre conduct at trial came as no surprise. The trial court had wrestled with the problem for almost a year.

On October 13, 1981 (two months after the second of appellant's employed attorneys had been granted leave to withdraw) appellant appeared in court and stated he wished to represent himself. The trial court advised appellant that the case would be tried November 12, 1981, and suggested that appellant retain an attorney.

Appellant, who was free on bond, did not contact an attorney until a week before the trial date. The attorney appellant contacted at that time was not retained.

On November 11, 1981, the day before trial, appellant telephoned the office of the circuit judge and stated he was too busy to appear for trial the following day. Appellant was evidently employed as an automobile auctioneer and salesman at his father's place of business.

A jury was present November 12, 1981, and the State announced ready for trial. Appellant appeared in court, advising the judge that he (appellant) had retained an attorney the previous evening. The judge contacted the attorney by phone and was advised that the attorney had been contacted by appellant's father the previous evening, and that the attorney had advised appellant's father that the attorney could not represent appellant at the scheduled trial.

These circumstances resulted in the trial being aborted and appellant being sentenced to 30 days' imprisonment for contempt.

On November 22, 1981, the court requested the public defender to represent appellant, and the defender consented.

On December 1, 1981, the public defender filed notice per § 552.030.2 [1] that appellant intended to rely on the defense of not guilty by reason of mental disease or defect excluding responsibility.[2] That same day (December 1, 1981) the court entered an order that appellant undergo a psychiatric examination and evaluation by one or more physicians designated by the Director of the Department of Mental Health.

On January 21, 1982, the public defender filed a motion for leave to withdraw as appellant's counsel, stating that appellant had become "intractable" with respect to undergoing the mental examination. The defender added that appellant had told him he was "fired." Appellant, the defender and the prosecuting attorney appeared in court that date (January 21, 1982) and the court admonished appellant to appear at the Nevada State Hospital on February 2,

---

**1.** References beginning with "§" are to RSMo 1978, as amended by Laws 1980, pp. 515–19.

**2.** When appellant had appeared for arraignment August 5, 1981, with private counsel, appellant had entered the sole plea of not guilty to all four Counts.

1982, for the examination. At this same hearing, the defender furnished the court a document bearing the signature "Jan W. Kakolewski, M.D." It said, "After examination it is my opinion that Mr. Howard can represent himself in the court." The public defender was not permitted to withdraw.

Appellant appeared at Nevada State Hospital for the examination as scheduled. The report of that examination, filed in the trial court on March 8, 1982, stated that in the opinion of the examining physician (Paul L. Barone, M.D.), appellant did not have a mental disease or defect and did not lack the capacity to understand the proceedings against him. Dr. Barone added that appellant was able to assist in his defense. The doctor did not recommend that appellant be held in a hospital facility for treatment pending determination by the court of the issue of mental fitness to proceed.

On April 7, 1982, the public defender appeared in court on his motion to withdraw. The motion was denied and the cause set for trial May 19, 1982.

On the trial date, a jury was present and the State announced ready for trial. Appellant appeared, accompanied by the assistant public defender. The assistant defender renewed the motion to withdraw, stating that appellant had insisted on representing himself, which appellant had the constitutional right to do. The court denied the request, observing that appellant's desire to represent himself would not excuse appellant from knowing the rules of evidence and those regarding the conduct of a trial. When asked by the court why he thought he was competent to represent himself, appellant stated he was a "good republican," and that he told the truth. Asked whether he was familiar with court rules, appellant responded, "I'll learn as we go along."

After further colloquy, including reference by appellant to the lie detector and his litigation in federal court, the court told the assistant defender he would have to represent appellant "the best you possibly can."

The State then took up a motion in limine seeking to prevent any mention to the jury of the polygraph examination. The court sustained the motion, ruling that no one would be permitted to mention the examination or its results.

Appellant stated repeatedly that he would use the examination in his defense. The court warned appellant that anyone doing so would be held in contempt.

Thereafter, the venire was seated and the court began reading MAI–CR 2d 1.02. Appellant interrupted with an outburst that included reference to the fact that he had passed the polygraph examination, and had suits filed in federal court. The tirade also included remarks of the tenor set out in paragraph numbered 1 of the majority opinion.

The court ordered appellant removed from the courtroom, and discharged the jury. Later that day, the court adjudicated appellant guilty of contempt and sentenced him to imprisonment for one year. This hearing was punctuated by intemperate and inappropriate comments by appellant. It was evidently this sentence for contempt that prompted appellant's letter of May 22, 1982, described in paragraph numbered 2 of the majority opinion.

On June 1, 1982, appellant's punishment for contempt was reduced to six months' imprisonment.

On June 9, 1982, "by agreement," the cause was set for trial September 21, 1982.

On June 16, 1982, appellant was ordered released from confinement.

On September 9, 1982, appellant, through the public defender, filed a joint application for change of venue and change of judge. There is no showing that it was noticed up for hearing prior to the trial date.

A jury appeared on the morning of September 21, 1982, and the State announced ready for trial. The public defender appeared, but appellant did not. At the court's direction, the defender telephoned appellant, who was at his place of employment, some 150 miles from the trial site. According to the defender, appellant "sorta

chuckled" and indicated he was not going to appear for trial, as he did not "feel like it today."

Appellant did, however, arrive at the courtroom at midafternoon. The court advised appellant that the defender wanted to talk to him, but appellant declined. At that point, outside the hearing of the venire, the defender verbally requested a further examination of appellant on the issue of his competence to proceed. The defender's comments in support of that request are set out in the majority opinion.

The court stated:

"Well, the record in this case will speak for itself. Even before Mr. Sterling requested to try to assist this defendant, an order was made for psychiatric examination. That examination was made and the file reflects that as a result of that examination he was found to be competent to stand trial.

The Court is very familiar with his conduct, and in the Court's opinion he has conducted himself in such a way as to hinder and delay the trial of this case. He's been committed to the Pulaski County jail on two different occasions for contempt of court. He has done everything he can to hinder and delay going to trial.

He was released from contempt for the purpose of having his parents to try to persuade him to seek whatever medical attention that was necessary, but his parents did not feel that he was incompetent in any respect."

The court denied the request for an additional examination.

The defender then renewed his request to withdraw as appellant's counsel, stating that if appellant was competent to proceed, he had waived the assistance of counsel by reason of his refusal to cooperate with the defender.

The court denied the request, stating that to grant it would aid and assist appellant in postponing the trial which had been

pending for almost two years.[3] The court then told appellant that the defender would be available for assistance or legal advice about "procedures and things of that kind."

Appellant replied, "Yes, sir. Thank you, sir, but no thank you." Appellant told the defender, "Just leave me alone. I don't even want to talk to you."

Despite this, the court told appellant the defender would be available in case appellant changed his mind. Other pretrial matters were then discussed, and the motion for change of judge and change of venue was denied. No error is assigned regarding that ruling.

Trial ensued, the highlights of which are reported in the majority opinion. During the court's final instructions to the jury, appellant interrupted with this remark:

"Your Honor, why are you doing this to me when I took a lie detector? You have the lie detector test says I didn't do it. Why are you doing this to me? Have the prosecutor show it to you."

Appellant was escorted from the courtroom, and the trial proceeded to conclusion.

Although appellant argues here that the trial court should have conducted a hearing to determine his competency prior to trial, appellant did not ask the trial court for that relief. What he requested (through the defender) was an additional mental examination. This request was made at midafternoon with a jury panel waiting to try the case. At that time, the results of the examination at Nevada State Hospital had been known for more than six months. During that time, appellant had made no request for an examination by a physician of his own choosing, § 552.020.5, nor had appellant contested Dr. Barone's opinion, § 552.020.7. In such circumstances, the court was authorized to determine appellant's fitness to proceed on the basis of that report. *Id.* Furthermore, as there was nothing rendering the psychiatric examination at Nevada State Hospital sus-

---

**3.** The occurrence out of which the charges arose took place May 26, 1980. For reasons unexplained in the record, the preliminary hearing was not held until July 14, 1981.

pect, it was not error to deny the untimely request for another examination. *State v. Shaw,* 646 S.W.2d 52, 54[5] (Mo.1983).

Even if appellant had requested a competency hearing, I fail to see what such a hearing would have accomplished. The trial court was already aware of the opinions of Dr. Kakolewski and Dr. Barone, and had observed appellant's conduct in court on earlier occasions. The court was also aware of the letter described in paragraph numbered 2 of the majority opinion, and of appellant's hostility toward the public defender. The conduct described by the defender at the start of the trial was merely cumulative to, not different from, that which the court was already aware.

It is evident that the court was convinced appellant had no mental disease or defect, and that appellant had the capacity to understand the proceedings against him and to assist in his defense. That finding is implicit, if not explicit, in the court's remarks denying the day-of-trial motion for another mental examination. Those instances during the trial in which the court indicated appellant did not understand what was taking place, or that his tactics were not wise, do not indicate, at least to me, that the court believed appellant lacked the mental capacity to proceed. Rather, they indicate concern that appellant's unfamiliarity with court procedure and his rejection of the defender's assistance were imperiling his defense.

Despite appellant's extraordinary behavior, the only two physicians who expressed an opinion on his competency to proceed (Kakolewski and Barone) pronounced him fit. Absent those reports, I would agree that appellant's conduct would have compelled an examination on that issue. Here, however, the court had two medical opinions about the matter, one from a doctor evidently selected by appellant. Moreover, the court had the opportunity—or chore—of observing appellant in person.

Accordingly, on this record, I would not convict the trial court of error in refusing the defender's request for another mental examination, or in failing to hold a competency hearing *sua sponte* when one was not requested.

If, as appears here, the trial court believed appellant was competent to stand trial, I cannot agree with the majority opinion that the trial court erred in allowing appellant "to pull the lead oar in his defense." So-called "hybrid representation" such as occurred here has been approved in similar cases. *State v. Harper,* 637 S.W.2d 170, 173[4, 5] (Mo.App.1982); *State v. Edwards,* 592 S.W.2d 308 (Mo.App.1979). In my view, the trial court, given the situation confronting it, handled the matter with commendable restraint and solicitude.

Certainly no defendant should be compelled to stand trial on a criminal charge if he is mentally unfit to proceed. Conviction of an accused, legally incompetent, violates due process. *Miller v. State,* 498 S.W.2d 79, 82[4] (Mo.App.1973). Here, however, the trial court was convinced that appellant was competent to proceed, and that appellant's persistent antics were an effort to frustrate the orderly adjudication of his guilt or innocence. This was the trial court's decision to make, *State v. Clark,* 546 S.W.2d 455, 468[14] (Mo.App.1976), and, on this record, there is competent and substantial medical opinion to support the trial court's conclusions, appellant's conduct to the contrary notwithstanding.

If, as said in the majority opinion, the proceedings below "amounted to a trial in name only," it was appellant's shenanigans that made it so. His mockery of the judicial process should not be rewarded.

Finding no merit in any of appellant's assignments of error as to Counts I, III and IV, I would affirm the judgment as to them.