STATE of Missouri, Respondent,

v.

William GALBRAITH, Appellant.

No. WD 37493.

Missouri Court of Appeals,
Western District.

Nov. 25, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 23, 1986.

Application to Transfer Denied
Feb. 17, 1987.

Sean O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before NUGENT, P.J., and BERREY and GAITAN, JJ.

NUGENT, Presiding Judge.

Defendant William Galbraith was tried for the murder of Gerald Johnson and the jury found him guilty of murder in the second degree, § 565.004 [1], and armed criminal action, § 571.015. He was sentenced to life imprisonment on the first count and thirty years' imprisonment on the latter, the sentences to run concurrently.

The defendant raises six points in this appeal, claiming that the trial court erred: (1) in failing to include a mens rea element in its jury instruction on the lesser included offense of manslaughter; (2) in giving MAI–CR2d 1.02 and MAI–CR2d 2.20 in that those instructions improperly define "reasonable doubt" as proof that leaves the jury "firmly convinced" of a defendant's guilt, thereby reducing the state's burden below that required by the due process provisions of the state and federal constitutions; (3) in denying the defendant an opportunity adequately to present his defense of self-defense in that a knife the police recovered from inside the victim's boot was not available for use as an exhibit at trial; (4) in overruling defendant's objection to statements made by the prosecutor during voir dire, in that the statements were calculated to persuade the veniremen at that preliminary stage of the proceedings; (5) in failing sua sponte to dismiss a juror who was incompetent or unable to fulfill his obligation; and (6) in overruling defendant's motion for a new trial without first holding a competency hearing to determine defendant's capacity to have waived his

---

1. Unless otherwise indicated, all sectional references are to the Revised Statutes of Missouri, 1978, as amended.

rights to proceed pro se and to testify at trial in light of a diabetic reaction that left him semi-comatose during portions of the trial.

For the reasons set forth below, we affirm the judgment.

On the evening of July 20, 1984, the victim, Gerald Johnson, started to drive his brother home from Alpha Liquidators on Troost Avenue near Linwood Boulevard in Kansas City where the brothers both worked, but his car quit running near 26th and Cleveland. Coincidentally, their father, Abe Johnson, drove by and saw that they were having car trouble. Abe took Gerald's brother home, drove Gerald back to Alpha Liquidators where Gerald hoped to find a mechanic to repair the car, and then went about his own business.

Raymond Battles, who knew both the victim and defendant Galbraith, testified about a conversation he had with Gerald Johnson at about 8:00 p.m. that evening. When Gerald explained to Battles that he needed a ride to get some money in order to have the car repaired, Battles suggested that defendant Galbraith, who ran a "bootleg cab service", drive Gerald downtown in exchange for $5.00. Galbraith agreed, and Battles saw Galbraith and Gerald Johnson leave together and return about one and one half hours later.

After Gerald's return, Battles engaged Gerald in conversation on the street across from the Yum Yum Lounge located at 3223 Troost Avenue. Raymond Battles and another witness, James Pace, both testified that while the victim was talking to Battles in front of the Yum Yum Lounge, defendant Galbraith approached the victim from behind and hit the victim in the head with a metal pipe that he swung with both hands. When the victim staggered, the defendant hit him again. Raymond Battles grabbed the defendant to stop him, and Galbraith dropped the pipe and went into the Yum Yum Lounge.

Police officers arrived at the scene and found the victim lying on the street. Before he was taken from the scene by ambulance, Officer Sherri Williams recovered a butcher knife from inside one of his paratrooper style mid-calf length boots. The victim's pant leg was outside the boot, covering it. Officer Williams placed the knife, which she described on the property slip as a wood-handled, ten-inch blade butcher knife, with the police department property and evidence unit. She checked the "safe keeping" box on the property slip rather than the "evidence" box, finding no reason to preserve the knife as evidence since it had not been used in any crime.

Gerald Johnson died ten days later. Dr. Bonita Peterson, the Jackson County Medical Examiner, performed an autopsy on the victim's body. She testified that Johnson's death resulted from oxygen deprivation to the brain caused by swelling of the brain and subsequent loss of blood supply. She stated that the swelling was caused by "blunt force head injury."

Defendant contends that he could not adequately present his defense of self-defense because the state was unable to produce the knife for use as an exhibit at the trial. Regarding the unavailability of the knife, Sergeant Ronald Ehrhardt, supervisor of the police department property and evidence unit, testified that according to routine police practices, a knife held for "safekeeping" such as the one recovered from Gerald Johnson's boot would be held for a minimum of ninety days and then disposed of if no one claimed it. For disposal, the knife would be placed in one of three barrels, each containing 200 to 300 dangerous weapons to be melted down at Armco Steel.

The butcher knife in question was placed in one of those barrels and commingled with several hundred other knives on January 29, 1985, coincidentally, the same week the case was first set for trial. On April 10, 1985, the property supervisor received a subpoena for the knife, and another subpoena several days later for the barrels. The barrels of contraband were not destroyed because of the subpoenas, but the officers were not able to distinguish the butcher knife from the knives in the various barrels. The property supervisor testi-

fied he had no knowledge that the knife was wanted as exculpatory evidence in this case until the subpoenas were issued.

Though the knife could not be produced for trial, the jury heard testimony regarding its existence, location, and description. In addition to the testimony of Officer Sherri Williams and Sergeant Ehrhardt, the jury heard the testimony of Yvonne Winzer, the bartender at the Yum Yum Lounge on the evening of July 20, 1984. She stated that at some earlier time that evening the victim and the defendant were engaged in an argument at the back of the bar during which she observed "a shining instrument" that appeared to her to be a knife in Gerald Johnson's hand. She testified that the victim and the defendant left the bar together and that the defendant reentered the bar alone about twenty minutes later. Eyewitness Raymond Battles stated that he never saw a knife in the victim's possession that night. The victim's brother testified that the victim used "a long butcher knife with a brown handle to it" to cut carpet in the course of his employment at Alpha Liquidators.

In addition to the above testimony about the knife, the prosecutor invited the defendant to exhibit a facsimile of the knife for demonstrative purposes to aid in presenting his defense, but the defendant chose not to do so. Also, the trial court permitted the defendant to submit a self-defense instruction to the jury.

Another of defendant's claims concerns statements made by the prosecutor during voir dire examination. The following colloquy took place:

[Prosecutor]: As I indicated, in Missouri, if you commit the crime of murder and you do so by means of a deadly weapon, then you have committed a separate crime, and that is armed criminal action.

Thus, there are two counts in this case. Murder in the second degree and armed criminal action. Basically, the state alleges that on July 20th, 1984, the victim in this case, twenty-nine-year-old Gerald Johnson, was with his brother.

They were going to do some work—

[Defense counsel]: Objection, Your Honor. This is improper voir dire. I believe the state does not get to argue its case or to state fully all the facts that it intends to or intends to attempt to prove in the voir dire portion of the trial.

[Prosecutor]: I'm just trying to find out if anyone knows anything about this.

At that point, the trial court overruled the objection and instructed the prosecutor to limit the description of the case to the minimum necessary to determine whether the prospective jurors had learned of the case through the media. One juror answered that she had read about the case in the newspaper, and she was later stricken for cause on defendant's motion.

The defendant bases another claim on the fact that when the members of the jury were polled as to whether they had voted yes or no on the verdict, juror Ellsworth A. Gallamore answered, "Here." The court then asked, "Was that yes? Mr. Gallamore, did you say—" to which he again responded, "Here." The court asked, "Do you mean to say yes or no?" Mr. Gallamore replied, "Yes."

Defendant's last claim centers upon his diabetic condition and its effect upon his decisions not to conduct his own defense and not to testify at trial. He first informed the court of his diabetes at trial on July 16, 1985, when the court made inquiry regarding the public defender's motion to withdraw upon defendant's request and defendant's oral motion to have new counsel appointed. Defendant stated that for about three months, the jail authorities had refused to give him insulin. He explained that he had experienced fainting spells and numbness in his hands and feet since the medication had been withheld and that he believed he was dying. With the exception of those comments, the issue of defendant's diabetes was not raised again during the trial.

Finding that the defendant was unable to identify any deficiency in counsel's per-

formance, the court overruled the motion to withdraw and the motion to appoint new counsel. The defendant next moved to conduct his own defense. Having determined that defendant had finished high school and had been through a previous jury trial, the court left the decision up to the defendant. During a lengthy colloquy, the court explained in detail the difficulties Mr. Galbraith might encounter in proceeding pro se and insisted that, in any event, the public defender remain in the courtroom for consultation. The court allowed the defendant to consider his motion overnight. The following day, the defendant withdrew his written waiver of right to counsel, and with the words "into her hands I commend my spirit," agreed to have the appointed counsel conduct his defense.

Near the end of the trial, Mr. Galbraith decided not to testify in his own behalf. The record, made outside the presence of the jury, reflects that Mr. Galbraith and his lawyer had extensive discussions about his right to testify throughout the case. Defense counsel stated for the record that she had informed him that, should he testify, his prior record would be admissible for impeachment purposes and that rebuttal evidence to his testimony might be introduced. She further explained that the defendant could instruct the jury that he had the right not to testify and that no inference could be drawn from his exercise of that right.

At the close of this exchange between defense counsel and the court, defendant Galbraith stated, "Well, with her guidance, I think I'll just let things stand as it is. I don't think I'll testify."

In his motion for a new trial, Mr. Galbraith claimed that he was in a semi-comatose state resulting from his untreated diabetic condition when he waived his right to represent himself and his right to testify, so that the waivers were not knowing, intelligent, or voluntary. At the August

23, 1985, hearing on the motion, the defendant testified that he drank two Cokes which aggravated his diabetic condition and rendered him semi-comatose at the time he waived his right to represent himself. He further stated that he could not recall deciding not to testify in his own behalf and that he did not understand his attorney's advice on the subject. He explained that, because the jail officials refused to give him insulin unless he moved to medical housing, he had resorted to eating minimal amounts of food to counter the effects of the diabetes.

The defendant's medical records from 1982 to 1984 revealed that he had been previously diagnosed as diabetic. The supervisor of the jail medical unit testified that the defendant had taken insulin injections when he arrived at the jail on August 10, 1984, but that he refused insulin treatment for eight months beginning January 1, 1985, when he began "fasting." The medical unit supervisor testified that if defendant were insulin dependent, he would have died. He stated that no particular mental or physical health problems developed after the defendant stopped taking insulin. Furthermore, tests taken after trial on August 12, 1985, reflected that defendant's blood sugar levels were "within a good range."

I.

The defendant contends that the approved instruction for conventional manslaughter, MAI–CR2d 15.18, as submitted in Instruction No. 6, is erroneous because it fails to articulate a culpable mental state as required by § 562.021.2.[2] He argues that the jury found him guilty of the charged offense of second degree murder because it was inadequately instructed on the lesser included offense of manslaughter.

In addition to objecting to Instruction No. 6, defendant offered Instruction "A"

2. Section 562.021.2 provides as follows:
Except as provided in section 562.026 if the definition of an offense does not expressly prescribe a culpable mental state, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly or recklessly, but criminal negligence is not sufficient.

which was refused. That instruction was based on new statutes effective October 1, 1984, which explain the mental state element of manslaughter. *See* §§ 565.023 and 565.024, which define respectively voluntary manslaughter and involuntary manslaughter with reference to a mens rea element.

■■■ The trial court properly refused to give Instruction "A" because it was based on new statutes not in effect at the time the offense was committed. *See State v. Newlon,* 627 S.W.2d 606, 613–14 (Mo.) (en banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). On July 20, 1984, when defendant Galbraith struck the victim with a metal pipe, the 1982 version of § 565.005 was still in force,[3] and was appropriately incorporated into MAI–CR2d 15.18 as submitted in Instruction No. 6. According to the Missouri Court of Appeals for the Eastern District, which addressed this issue in *State v. Johnson,* 672 S.W.2d 160, 163 (Mo.App. 1984),

> The definition of manslaughter does not include specific intent as a necessary element. Section 565.005, RSMo 1978; *State v. Boyer,* 646 S.W.2d 876, 879 (Mo. App.1983). MAI–CR2d 15.18 correctly submits the offense of manslaughter. *State v. Boyer, id.; State v. Eldridge,* 564 S.W.2d 603, 606 (Mo.App.1978).…

### II.

In his second point, defendant contends that by defining proof "beyond a reasonable doubt" as proof that leaves a juror "firmly convinced of a defendant's guilt", MAI–CR2d 1.02 and MAI–CR2d 2.20 have reduced the state's burden of proof below that required by the due process clauses of Article I, Section 10 of the Missouri Constitution and the Fourteenth Amendment of the United States Constitution.

Defendant properly preserved the point for appellate review by complying with Rule 28.03 and Rule 29.11(d).

■■■ We are bound by the many decisions of this court to deny review of mandatory approved instructions, the approval of which the Supreme Court has reserved to itself under Rules 28.01 and 28.02.[4] *See State v. Turner,* 705 S.W.2d 108, 110 (Mo. App.1986); *State v. Mick,* 674 S.W.2d 554, 558 (Mo.App.1984).

We note, ex gratia, that the United States Court of Appeals for the Fifth Circuit recently approved a jury instruction which defined proof beyond a reasonable doubt as "proof that leaves you firmly convinced of a Defendant's guilt." *United States v. Hunt,* 794 F.2d 1095, 1100–01 (5th Cir.1986). The court agreed with the government that "firmly convinced" seems little different from "a real doubt," a definition which it had earlier approved. *Id.,* citing *United States v. Alonzo,* 681 F.2d 997 (5th Cir.1981), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982); *United States v. Schaffer,* 600 F.2d 1120 (5th Cir.1979). *See also United States v. Jensen,* 561 F.2d 1297, 1301 (8th Cir.1977) (an instruction which made evaluation of reasonable doubt contingent upon whether one "is satisfied of the defendant's guilt" and upon whether one has "an abiding conviction of defendant's guilt" did not constitute plain error).

■■■ On the persuasive authority of the Fifth Circuit, we would approve the language contained in MAI–CR2d 1.02 and

---

**3.** Section 565.005 was intended to be repealed as of July 1, 1984, pursuant to L. 1983 S.B. 276 § 1. The date was amended to October 1, 1984, by L. 1984 S.B. 448 § A. The statute as published in the 1982 Supplement to the Missouri Revised Statutes provided that "[e]very killing of a human being by the act, procurement or culpable negligence of another, not declared by law to be murder or excusable or justifiable homicide, or vehicular manslaughter, shall be deemed manslaughter."

**4.** But see Judge Dixon's view that the defendant's right of direct appeal is unconstitutionally burdened by the restrictive application of Rule 28.02 which constrains us to deny review of the required criminal jury instructions. *State v. Singer,* 719 S.W.2d 818 (Mo.App.1986) (dissenting opinion).

MAI–CR2d 2.20, had we the authority to pass upon the question.

### III.

For his third point, defendant contends that he could not adequately present his defense of self-defense because the state was unable to produce for use as an exhibit at trial the knife recovered by a police officer from inside the victim's boot.

In arguing that the trial court erred in failing to dismiss the charges against him, the defendant claims prejudice on two grounds. First, he claims lack of good faith by the prosecuting authorities because the police department disposed of the knife. Second, he asserts that the actual knife in evidence would have served as potent corroboration of Yvonne Winzer's testimony that she saw what appeared to be a knife in Gerald Johnson's hand. According to the defendant, the loss of the impact the physical presence of the knife would have had on the jury incalculably prejudiced his defense.

Defendant cites both *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Picariello,* 568 F.2d 222 (1st Cir.1978), in support of his position. He relies principally upon *Picariello* which presented a three-pronged test to ascertain whether a defendant's right to due process has been prejudiced by destruction of evidence by state authorities: "[F]irst, was the evidence material to the question of guilt or the degree of punishment; second, was defendant prejudiced by its destruction; and third, was the government acting in good faith when it destroyed the evidence." *Id.* at 227, citing *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196 (1963); *United States v. Heiden,* 508 F.2d 898, 902 (9th Cir.1974); *United States v. Sewar,* 468 F.2d 236 (9th Cir. 1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973); *United States v. Bryant,* 439 F.2d 642, 651 (1971); *United States v. Keogh,* 391 F.2d 138, 147 (2nd Cir.1968), and making reference to Comment, *Judicial Response to Governmental Loss or Destruction of Evidence,* 39 U.Chi. L.Rev. 542, 563–65 (1972).

The facts of the *Picariello* case, dispositive of the present issue, are as follows: Defendant Picariello was convicted of transporting explosives in interstate commerce with the knowledge and intent that the explosives would be used to intimidate people and to damage property in violation of 18 U.S.C. § 844(d) and 18 U.S.C. § 2. *Id.* at 224. Explosives experts and F.B.I. agents were called to render safe dynamite wired to timing devices found in a car abandoned by the defendant. The dynamite was transferred to a magazine for safe storage by Massachusetts authorities. Later, a Massachusetts explosives expert destroyed the dynamite pursuant to state practice because he noticed that it was dripping nitroglycerin and could no longer be safely stored. No one connected with the prosecution of the case was involved in the destruction of the explosives. *Id.* at 227. In fact, the prosecutor learned of the destruction by way of the explosives expert's testimony at trial. *Id.* at 229.

The *Picariello* court distinguished the fact situation from that presented in *Brady v. Maryland, supra,* where the prosecuting authorities withheld exculpatory evidence requested by the accused. The court then proceeded to apply the balancing test in reverse order, easily finding no bad faith by the federal law enforcement officials, who took no part in destroying the dynamite. The court refused to find that destruction of the evidence by the state authorities in the interest of public safety, without more, established prejudice as a matter of law.

The court jointly considered the elements of materiality and prejudice. The presence of the dynamite at trial was found not to be material to proving that the dynamite would in fact explode, so as to qualify as an explosive under the statute, because expert testimony sufficed. Finally, the court concluded that Picariello's defense was not prejudiced by the destruction of the dynamite largely because the parties

did not dispute the evidence pertaining to the dynamite. *Picariello* at 228.

In applying *Picariello*'s three factor test we note that this or a similar test has been employed in several cases from the United States Court of Appeals for the Eighth Circuit. *See, e.g., Cody v. Solem,* 755 F.2d 1323, 1331 (8th Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *United States v. Doty,* 714 F.2d 761, 764 (8th Cir.1983), quoting *United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2nd Cir.1980) (whether due process has been violated by the government's suppression of exculpatory evidence involves an "assessment of the government's culpability for the loss, together with a realistic appraisal of its significance ..., its bearing upon critical issues in the case and the strength of the government's untainted proof."); *United States v. Williams,* 604 F.2d 1102, 1116 (8th Cir.1979). *See also Hemphill v. State,* 566 S.W.2d 200, 203–205 (Mo.1978) (en banc).

We address first defendant's claim of lack of good faith on the part of the prosecuting authorities. The defendant points out in his appellate brief that though items held for safekeeping by the police are routinely discarded after ninety days, the butcher knife removed from Gerald Johnson's boot was held for approximately twice that time and then discarded as the original trial date approached. The defendant would distinguish the loss of the knife in the present case from the exigent circumstances requiring the immediate destruction of the dynamite in *Picariello.*

Nothing in the record suggests that the state prosecuting authorities acted in bad faith in the present circumstances. As in *Picariello,* no one connected with the prosecution of this case was involved in the decision to dispose of the knife. Instead, police officers with no knowledge of the pending court case disposed of the knife according to standard departmental procedures. The supervisor of the police department's property and evidence unit did not become aware that the knife was wanted for evidence until he received a subpoena

to produce it, whereupon he discovered that it had been commingled in one of several barrels of contraband awaiting disposal. He ordered that the barrels be held at the police station to comply with the subpoena to the best of his ability.

We can only describe the actions taken by the police department as earnest efforts to preserve the evidence once a discovery request was made. Furthermore, the state, "once informed that the evidence was no longer available, presented a valid nonpretextual explanation for its loss." *Picariello, supra,* 568 F.2d at 228, citing *United States v. Augenblick,* 393 U.S. 348, 355–56, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). This showing of good faith by the police department and the state's lack of involvement in the destruction of the knife bring the present facts within the ambit of the *Picariello* case and distinguishes them from those in *Brady v. Maryland, supra.*

■ Considering together the materiality and prejudice factors of the test, we conclude that the trial court did not err in failing to dismiss charges against the defendant. Though the trial court instructed the jury on defendant's claim of self-defense, the evidence on the record was not sufficient to support the instruction. We, therefore, question the materiality of the knife. To require the giving of an instruction on self-defense, the evidence must demonstrate that:

(1) the defendant was not the aggressor and did not provoke the use of force against himself, (2) there was a real or apparently real necessity to kill to save himself from an immediate danger of serious bodily harm or death, (3) the defendant had reasonable cause for such belief, and (4) the defendant did all within his power consistent with personal safety to avoid the danger and the necessity to take life, even to the point of retreat.

*State v. Fincher,* 655 S.W.2d 54, 58–59 (Mo.App.1983), quoting *State v. Grier,* 609 S.W.2d 201, 203 (Mo.App.1980). *See also* § 563.031.

The evidence most favorable to defendant's claim of self-defense is the testimony of the bartender, Yvonne Winzer, that she saw what appeared to be a knife in Gerald Johnson's hand earlier that evening when he and defendant Galbraith argued inside the Yum Yum Lounge. The knife was not brandished later when the defendant struck the victim on the head with a metal pipe. The defendant approached the victim from behind, indicating that the victim never saw him. Finally, a police officer recovered the knife from the victim's boot, which was covered by his pant leg, while the victim lay unconscious on the · pavement. The record simply does not establish a prima facie case of self-defense. *See State v. Chambers,* 714 S.W.2d 527, 531 (Mo.1986) (en banc).

A defendant cannot be prejudiced in presenting a defense to which he was not entitled. *Cf. State v. Richardson,* 321 S.W.2d 423, 429 (Mo.1959). Even assuming that the self-defense instruction given was warranted by the evidence, we find no prejudice to the presentation of defendant's defense occasioned by the fact that the knife recovered at the scene could not be produced at trial. The state never contested its existence or in any way hampered the defendant from injecting the issue of self-defense into the trial. *See United States v. Picariello, supra,* 568 F.2d at 228. The jury heard testimony regarding the knife, including that of Yvonne Winzer, Officer Williams and Sergeant Ehrhardt. Indeed, Officer Sherri Williams and Sergeant Ehrhardt, whose testimony provided a vivid description of the knife and its whereabouts, were both called as witnesses on behalf of the state. Furthermore, the prosecuting attorney invited the defendant to exhibit a facsimile of the knife as demonstrative evidence, an accepted procedure under Missouri law. *State v. Dodson,* 642 S.W.2d 641, 643 (Mo.1982); *State v. Nelson,* 484 S.W.2d 306, 307 (Mo.1972). The defendant, having chosen not to display a facsimile knife, cannot now bemoan the loss of the visual impact a knife might have had upon the jurors.

The record reveals no prejudice to the defendant traceable to the disposal of the knife.

## IV.

Defendant's fourth point—that the trial court erred in permitting the prosecutor to describe the crime alleged during voir dire—must be denied. A trial court has broad discretion in determining the propriety of questioning during voir dire. The reviewing court should not interfere unless the record reflects a manifest abuse of discretion and a real probability of injury to the complaining party. *State v. Abbott,* 654 S.W.2d 260, 274 (Mo.App.1983), citing *State v. Scott,* 515 S.W.2d 524, 527 (Mo. 1974). *See State v. Holland,* 653 S.W.2d 670, 678 (Mo.) (en banc 1983).

The prosecutor's description of the alleged crime to the extent necessary to determine whether any members of the venire had been influenced by pretrial media coverage of the case was entirely proper. *Cf. United States v. Brown,* 540 F.2d 364, 377–78 (8th Cir.1976). In fact, the questioning revealed that one member, whom the defendant subsequently disqualified for cause, had read about the case in the newspaper. The defendant suffered no injury as a result of the prosecutor's statements.

## V.

Defendant's fifth claim challenges the failure of the trial court to set aside the verdict because of juror Gallamore's momentary inattentiveness before responding, "Yes," when the jury was polled. Defendant was clearly not prejudiced by the juror's lapse of attention at this stage of the trial. *Cf. State v. Tabor,* 657 S.W.2d 317, 320 (Mo.App.1983) (juror's momentary lapse of attention was not prejudicial).

## VI.

Defendant cites *State v. Moon,* 602 S.W.2d 828, 834–36 (Mo.App.1980), in sup-

port of his claim that the trial court should not have proceeded to rule upon his motion for new trial without first requiring sua sponte a competency examination in light of evidence that the defendant was semi-comatose during portions of the trial due to an untreated diabetic condition. Defendant asserts that had he been lucid at trial he would not have waived the right to proceed pro se or the right to testify in his own behalf.

"No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." § 552.020.1. "Whenever any judge has reasonable cause to believe that the accused has a mental disease or defect excluding fitness to proceed", he has a duty, sua sponte or on motion filed by the state or by the defendant, to order a psychiatric examination. § 552.020.2. If necessary thereafter, he may order a hearing to make a determination on the issue. *Howard v. State,* 698 S.W.2d 23, 25 (Mo. App.1985). A judge may make the motion "at any stage of the proceedings." *Id.* We assume, without deciding, that such a motion sua sponte could properly be made in the course of the hearing on the motion for new trial. *See also State v. Carroll,* 543 S.W.2d 48, 51 (Mo.App.1976). (No per se rule prohibited the appellate court from remanding the case for the trial court to hold a retrospective competency hearing.)

The test on the question of defendant's mental capacity to proceed as articulated in *State v. Vansandts,* 540 S.W.2d 192, 202 (Mo.App.1976), is "whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him."

Nothing in the record suggests that defendant Galbraith did not meet that standard. During the lengthy colloquy between defendant and the court regarding defendant's motion to proceed pro se, the defendant was responsive to the court's questions and showed no outward signs of erratic behavior. In fact, after conducting a lengthy inquiry, which nearly exactly paralleled the inquiry prescribed in the appendix to *State v. Quinn,* 565 S.W.2d 665, 676–77 (Mo.App.1978), the court was satisfied that the defendant was capable of conducting his own defense. The court left the decision up to the defendant, with the proviso that the public defender remain in the courtroom for consultation in the event the defendant decided to proceed pro se. After taking the night to consider the question, the defendant made the decision not to waive his right to counsel. Similarly, the record made concerning the defendant's decision not to testify in his own behalf indicates that the defendant had the mental capacity to proceed with trial. Furthermore, Mr. Galbraith's decisions to retain appointed counsel and not to testify were intelligent decisions, based upon sound trial strategy, and were in no way aberrational. *But cf. State v. Howard,* 668 S.W.2d 191, 195 (Mo.App.1984) (defendant who was allowed to proceed pro se was not competent "to call the shots in his defense").

Neither defendant nor defense counsel protested that the defendant was not competent to stand trial as was their prerogative under § 552.020.2, nor did they mention to the court that the defendant had consumed the two soft drinks that defendant later identified as the source of his problem. Indeed, defendant's claim of trial incompetency was not developed before submission of the motion for new trial and the hearing on the motion. Moreover, the trial court was not required to believe testimony of trial incompetency presented in connection with the motion for new trial, particularly since it was in conflict with the trial court's own observations. *State v. Lasiter,* 562 S.W.2d 751, 756 (Mo.App. 1978). The *Lasiter* court held that the trial court did not err in failing to order, sua sponte, a psychiatric examination. Though defendant Lasiter did not raise his claim of trial incompetency until the hearing on the motion for new trial, twice during the trial he made the court aware that he had con--

sumed valium. Each time, the court made inquiry short of ordering an examination to satisfy itself of Mr. Lasiter's competency to proceed.

 While no Missouri case speaks to a defendant's competency to stand trial in light of the mental effects of a diabetic condition, case law establishes that

> suspicion or actual presence of some degree of mental illness or need for psychiatric treatment does not equate with incompetency to stand trial ... Neither does the fact of commitment in a mental hospital, ... considerable emotional disturbance, ... nor alcoholism and drug addiction, ... make a defendant incompetent as a matter of law.

*King v. State*, 581 S.W.2d 842, 846 (Mo. App.1979), quoting *McDonald v. State*, 572 S.W.2d 633, 635 (Mo.App.1978). *See also* § 552.010 (mental disease or defect defined).

For the foregoing reasons, we affirm the judgment.

All concur.