STATE of Missouri, Respondent,

v.

Barry J. WEATHERSPOON, Appellant.

No. WD 37624.

Missouri Court of Appeals, Western District.

Feb. 24, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 31, 1987.

Application to Transfer Denied May 19, 1987.

Sean O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Timothy W. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before CLARK, P.J., and NUGENT and LOWENSTEIN, JJ.

NUGENT, Judge.

Defendant Barry J. Weatherspoon was tried for shooting Michelle Marion in the chest with a .12 gauge shotgun. The jury found him guilty of assault in the first degree, § 565.050 [1], and armed criminal action, § 571.015. The court imposed concurrent terms of twenty-six years in prison for each offense. Defendant was also charged with capital murder [2] for shooting and kill-

---

**1.** All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

**2.** Section 565.001, defining the offense of capital murder, has since been repealed. L. 1983 S.B. 276 § 1, effective Oct. 1, 1984 (L. 1984 S.B. 448 § A).

ing Roberta Loy Hearn during the same incident, but that charge was severed for trial. *See State v. Weatherspoon*, 716 S.W.2d 379 (Mo.App.1986) (defendant's conviction of capital murder affirmed).

The defendant raises six points in this appeal, claiming that the trial court erred: (1) in overruling his challenge for cause against venireman Hulda Peterson, who initially indicated a belief that the defendant should present evidence of innocence to counter the state's evidence of guilt; (2) in giving MAI–CR2d 1.02 and MAI–CR2d 2.20 in that those instructions improperly define "reasonable doubt" as proof that leaves the jury "firmly convinced" of a defendant's guilt; (3) in overruling defendant's motion in limine to exclude the details of Roberta Loy Hearn's death as irrelevant; (4) in allowing the state, over defendant's objection, to cross-examine Dr. Mandracchia and Dr. Hornstra about whether defendant had a mental disease or defect even though defendant had asserted the mental defense of diminished capacity, not insanity; (5) in giving jury instructions number 7 and number 9 and in refusing instructions "B" and "C" in that the language in the instructions given did not emphasize the state's burden to prove that defendant acted with the specific intent to kill or cause serious physical injury, and (6) in violating double jeopardy principles by submitting jury instruction number 13, the verdict director for armed criminal action, in addition to the verdict director for first degree assault.

For the reasons set forth below, we affirm the judgment.

Michelle Marion and Roberta Loy Hearn, long distance operators employed by A.T. & T., had shared an apartment at the Colonial Estates Apartments in Raytown since 1981. Roberta Hearn and the defendant had been dating for several years. In the summer of 1983, she began to date other men as well and by January, 1984, had decided to end her relationship with the defendant. He became distraught and on several occasions tried to persuade her to change her mind. Ms. Marion testified that the couple had an unusually violent argument on February 2, 1984, ending when the defendant thrust his fist through Ms. Hearn's dressing table mirror.

A few days later, defendant Weatherspoon questioned Denise Carroll, a co-worker at the Bendix Corporation, about the murder of her sister in 1976. He was particularly curious about the sentence the murderer had received and about the possibility of parole. Denise Carroll recalled that, about a week earlier, she and the defendant had discussed a newspaper article about a family that had been killed. The defendant also asked another co-worker, Steven McCarty, what type of shot a hunter would use to kill large game such as deer. Later, the defendant would use deer slugs in the double shooting of Roberta Hearn and Michelle Marion.

On February 8, 1984, Roberta Hearn said goodbye to her roommate and left the apartment shortly after 7:00 a.m. to go to work. Moments later, Michelle Marion heard a car horn and, assuming her roommate was signaling her because she had forgotten something, went to the hall door leading to the parking lot and opened it. She saw Roberta Hearn moving around in her car and sounding the horn while the defendant stood on the sidewalk matching her movements in order to keep a .12 gauge shotgun aimed at Ms. Hearn.

Seeing her roommate in trouble, Michelle Marion shouted "Barry stop, stop." Defendant Weatherspoon pivoted, then raised his shotgun, pointed it at Ms. Marion, and fired. The force of the gunshot knocked her into the hallway of the apartment building. She made her way back to the apartment, reached for the phone in an attempt to call the police, and then collapsed from her injuries. Dr. Bela Csaki, who later treated Michelle Marion at the emergency room of Park Lane Hospital, stated that her heart had been contused by the blow of the gunshot and that the lower lobe of her left lung was so seriously injured that it had to be removed.

After seeing her friend shot, Roberta Hearn scrambled out the passenger side of her car, ran across the parking lot toward a car that had just pulled in, and pleaded for help. Defendant calmly pursued her while

reloading his shotgun and shot her in the neck before she could enter the car. Then the defendant reloaded the shotgun and at close range fired a slug into her head, causing it to explode. For the third time, defendant reloaded the shotgun and fired the final shot, this time striking Roberta Hearn in the lower back.

A number of witnesses saw the defendant calmly walk away from Roberta Hearn's body after the shooting. He entered the car he had borrowed that morning so that Ms. Hearn would not detect his presence and drove past her body as he left the scene. Police arrested him a short time later at a friend's house.

The defendant's first claim of trial error concerns the voir dire examination of a member of the venire, Hulda Peterson. Ms. Peterson acknowledged that she had heard or read a news report associating defendant Weatherspoon's name with the shooting but had formed no opinion about whether he had in fact done the shooting. Defense counsel asked Ms. Peterson whether she would have difficulty presuming Barry Weatherspoon innocent. Ms. Peterson responded, "If proven." The following colloquy took place:

> Ms. Chapman: You understand, ma'am, that the burden of proof is on the state and he is, by law, presumed to be innocent. Would you require, after knowing what you know from pre-trial publicity, would you require him to prove his innocence?
>
> Venireman Peterson: It would be nice if he could.
>
> Ms. Chapman: I'm going to ask you what you mean by that.
>
> Venireman Peterson: Well, since the state is presenting a case, it looks like his attorneys would present a case....

Ms. Peterson repeated three more times her notion that the defendant should present some evidence since the state would present evidence. Then, she indicated that she would still require the defendant to present evidence in order to find him not guilty, even if the state failed to prove its case beyond a reasonable doubt.

At that point, the prosecutor, taking a different approach, asked Ms. Peterson whether she would have difficulty following the judge's instructions advising her that, even if he never presents a witness in his defense, the defendant must be found not guilty if the state failed to prove defendant's guilt beyond a reasonable doubt. Ms. Peterson replied, "I'd have to follow his instructions." Defense counsel reexamined her at least six times about her ability to follow the judge's instructions in light of her earlier position. Each time Ms. Peterson indicated in unequivocal terms that she would have no difficulty following the judge's instructions—even if Barry Weatherspoon presented no defense.

At trial, the defendant also objected that the introduction of evidence of the shooting of Roberta Loy Hearn that did not directly bear upon the shooting of Michelle Marion could only serve to arouse the passions of the jury. The court overruled defendant's motion in limine to exclude the testimony of five witnesses, including the testimony of four witnesses who saw him shoot Roberta Hearn but not Michelle Marion. The defendant's contemporaneous objections to their testimony were also overruled. Harland Taft testified that he saw defendant shoot a lady near a hallway and then shoot another lady in the middle of the parking lot. Connie Faustlin, Janet Reynolds, and Christopher Huff each testified that they heard an explosion—presumably the shooting of Michelle Marion—and then went to a window in time to see the defendant shoot Roberta Hearn. Kellye Adams testified that when she pulled into the parking lot to pick up a friend for school, she saw the defendant pursue Roberta Hearn and fire his gun.

Barry Weatherspoon's defense centered on his claim that he was emotionally upset by the termination of his relationship with Roberta Hearn, that he intended to kill himself in front of her, and that he did not know why he shot Michelle Marion. Initially, the defendant had asserted that he had a mental disease or defect that prevented him from being responsible for his conduct. He abandoned the insanity defense before any testimony was taken at trial, however,

and instead asserted the defense of diminished capacity.

Dr. Steven A. Mandracchia and Dr. Robin K. Hornstra, both psychiatrists, each testified that the defendant was unable to form the specific intent required to commit the offense of first degree assault because of his severe emotional disturbance. In cross-examining the psychiatrists, the prosecutor referred to their psychological examinations of the defendant made in relation to the by then abandoned insanity defense. Over defendant's objection, the prosecutor questioned Dr. Mandracchia about various tests given to defendant to determine his sanity. Furthermore, the prosecutor established that the defendant had no "intellectual mental disease or defect." Similarly, the prosecutor elicited statements from Dr. Hornstra that the court ordered a psychological examination because the defendant originally intended to rely on the defense of insanity and that the defendant did not suffer from a mental disease or defect preventing his mental responsibility for his conduct.

### I.

The defendant first claims that the trial court should have sustained his voir dire challenge for cause of Hulda Peterson. He argues that Ms. Peterson's notion that the defendant should present evidence of his innocence to counter the state's evidence of guilt prevented her from being a fair and impartial juror.

The trial court has wide discretion in determining qualifications of a prospective juror, and its ruling will be disturbed on appeal only when the record shows a manifest abuse of that discretion and a real probability of injury to the complaining party. *State v. Betts*, 646 S.W.2d 94, 98 (Mo.1983) (en banc). Because the trial court is in a far better position to determine a challenge for cause than an appellate court, all doubts should be resolved in favor of the trial court's finding. *State v. Treadway*, 558 S.W.2d 646, 647 (Mo.1977) (en banc), *cert. denied*, 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), *overruled on other grounds, Sours v. State*, 593

S.W.2d 208 (Mo.) (en banc), *vacated*, 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980), *on remand*, 603 S.W.2d 592 (Mo. 1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 118 (1981), and *disapproved on other grounds, Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Moreover, the determination that a prospective juror is qualified is not made on the basis of his or her initial response but is instead based on the entire examination. *Id.* at 649–50.

According to *State v. Betts, supra*, 646 S.W.2d at 99, "whatever personal opinions a juror has about the merits of the law are immaterial except when they are so unyielding as to preclude a juror from following the court's instructions." In *State v. Johnson*, 670 S.W.2d 882, 886–87 (Mo.App. 1984), the appellate court affirmed the trial court's ruling that venireman Harris was a qualified juror on the basis of his demonstrated willingness to follow the law despite his personal opinion that an accused's failure to testify indicated guilt. *See also State v. Savage*, 621 S.W.2d 116, 117–19 (Mo.App.1981).

This court, in surveying the numerous opinions dealing with challenges for cause, determined that the critical test appears to be whether the venireman gave an equivocal or unequivocal response to questions intended to rehabilitate him. *State v. Brooks*, 693 S.W.2d 211, 214–15 (Mo.App. 1985). Where the potential juror's response was unequivocal, the appellate courts have affirmed a trial court's refusal to strike for cause. *Id.* at 214, citing *State v. Johnson, supra*, 670 S.W.2d at 887 (venireman Harris was sufficiently rehabilitated by way of leading questions which called for and elicited affirmative responses); *State v. Gray*, 657 S.W.2d 296, 299 (Mo.App.1983); *State v. Jones*, 661 S.W.2d 814, 816 (Mo.App.1983); and *State v. Ransburg*, 540 S.W.2d 172, 174 (Mo.App.1976). On the other hand, where the venireman gave equivocal answers, the appellate courts reversed the refusal to strike for cause. *State v. Brooks, supra*, at 214, citing *State v. Hopkins*, 687 S.W.2d 188 (Mo.1985) (en banc); *State v. Land*, 478

S.W.2d 290, 291 (Mo.1972); *State v. De-Clue*, 400 S.W.2d 50, 55–57 (Mo.1966); and *State v. Merritt*, 589 S.W.2d 359 (Mo.App. 1979).

*State v. Leipus*, 675 S.W.2d 896, 899 (Mo.App.1984), summarizes the rule: "When a prospective juror states unequivocally that he can be impartial, and when the entirety of the voir dire makes it reasonable for the court to believe the potential juror, the court's exercise of discretion on a motion to strike for cause should not be disturbed on appeal." The *Leipus* court added that this rule does not apply where the answers of the prospective juror are equivocal and disclose uncertainty about his ability to be impartial.

■ In the present case, Ms. Peterson stated many times in unequivocal terms that she would be able to follow the judge's instructions without difficulty. The trial court was entitled to find that she was a qualified juror.

II.

In his second point, the defendant contends that by defining proof "beyond a reasonable doubt" as proof that leaves a juror "firmly convinced of a defendant's guilt", MAI–CR2d 1.02 and MAI–CR2d 2.20 have reduced the state's burden of proof below that required by the Due Process clauses of Article I, Section 10, of the Missouri Constitution and the Fourteenth Amendment of the United States Constitution.

Since this case was submitted, however, the Supreme Court of Missouri has decided this issue adversely to defendant's position. *State v. Antwine*, No. 67720, slip op. at 19–21 (Mo. January 13, 1987).[3] The court upheld that MAI–CR definition in the face of the same due process challenge. *See also State v. Galbraith*, 723 S.W.2d 55 (Mo.App.1986).

III.

The defendant next argues that the testimony of five witnesses regarding the death of Roberta Loy Hearn did not tend to prove or disprove a material fact in issue in the assault case and was, therefore, irrelevant. *State v. Berry*, 609 S.W.2d 948, 954 (Mo. 1980) (en banc). He contends that the shooting of Michelle Marion, which took place before the shooting of Ms. Hearn, was a separate and unrelated act. He relies upon *State v. Wright*, 582 S.W.2d 275, 277 (Mo.1979) (en banc), for the settled principle that admission of evidence of unrelated crimes committed by a defendant violates the defendant's right to be tried only for the offense for which he was indicted.

Moreover, he contends that the fact that four of the five witnesses who testified did not even see the assault upon Michelle Marion raises the issue of prejudice in addition to the problem of relevance: The defendant claims that the repetitious accounts of the shooting of Ms. Hearn could only have served to arouse the passions of the jury against him, thereby tainting the conviction and the jury's recommendation of punishment.

■ The recognized exceptions to the general rule excluding proof of the commission of separate and distinct crimes by the defendant permit evidence of other crimes which tends to establish identity of the defendant, motive, intent, absence of mistake or accident, or "a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others." *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954) (en banc); *State v. Niehoff*, 395 S.W.2d 174, 180 (Mo.1965).

■ According to *State v. King*, 588 S.W.2d 147, 150 (Mo.App.1979), equally well recognized in our state is the parallel exception to the "common scheme or plan exception." That parallel exception permits proof of another crime if the other crime is so linked in point of time and circumstance with the crime charged that

---

**3.** Remanded on February 17, 1987 to trial court for evidentiary hearing on *Batson v. Kentucky*, 478 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), issue, Missouri Supreme Court retaining jurisdiction.

one cannot fully be shown without proving the other.[4] The court held (at 150) that

> [u]nder this latter exception, the state is permitted to paint a complete and coherent picture of the crime charged and is not required to sift and separate the evidence and exclude the testimony tending to prove the crime for which defendant is not on trial. *State v. Sinovich*, 329 Mo. 909, 46 S.W.2d 877, 880 (1931); *see State v. Torrence*, 519 S.W.2d 360 (Mo.App. 1975).

In other words, the exception permits evidence of a separate crime that is part "of a continuous occurrence intimately connected with the crime for which the defendant was being tried" because such evidence is part of the res gestae. *State v. Gray*, 478 S.W.2d 654, 669 (Mo.1972); *State v. Garner*, 530 S.W.2d 420, 423 (Mo.App.1975); *State v. Morris*, 523 S.W.2d 329, 331 (Mo. App.1975).

■ Testimony disclosing the circumstances of Roberta Loy Hearn's death was admissible under the exception permitting evidence of closely intertwined offenses as part of the res gestae. *See State v. Gray, supra* at 669 (the trial court did not err in permitting Sheriff Ramsey to testify that defendant shot and wounded him at the time Deputy Phillips was killed; furthermore, the defendant was not prejudiced by that testimony even though he was later acquitted on the charge of shooting Sheriff Ramsey on the ground of self-defense); *State v. Kenley*, 701 S.W.2d 185, 186 (Mo. App.1985) (the trial court did not err in admitting testimony relating to a homicide committed in the course of a crime spree which began in Poplar Bluff, Missouri, in the late hours of January 3, 1984, and ended in Corning, Arkansas, on January 4). As stated in *State v. Torrence, supra*, 519 S.W.2d at 361, "to require the State to segregate and exclude the various actions by defendant would create a hiatus in an obviously continuing transaction."

■ The testimony of the five witnesses was also admissible under the exceptions to the general rule that permit evidence of other crimes which tends to establish intent, absence of mistake or accident, or the existence of a common scheme or plan. In view of the fact that the defendant's identity was admitted in his opening statement and the rule that the crime of assault does not require that a motive be established, the exceptions for identity and motive are not applicable here. Moreover, the fact that the defendant admitted identity was the ground upon which the trial court excluded exhibits and testimony that would have elaborated upon the graphic and gruesome details of Ms. Hearn's death.

The record reflects, however, that the trial court allowed the testimony of the five witnesses primarily as evidence of the defendant's intent in light of the state's burden to rebut the defense of diminished capacity asserted in defendant's opening statement. *Cf. State v. Flores*, 332 Mo. 74, 55 S.W.2d 953, 955 (1932) (the state had a right to show the defendant's mental condition a reasonable time before and after the crime was committed as evidence bearing upon the question of insanity). *See also State v. Tabor*, 657 S.W.2d 317, 320 (Mo. App.1983) (evidence that explains, counteracts, repels or disproves the evidence offered by the defendant, whether directly or by implication, is proper rebuttal and does not constitute reversible error absent a clear abuse of discretion or prejudice to the defendant).

Where evidence is clearly admissible to show intent, however, the question then arises whether at some point the prejudicial effect of the repetitive accounts of Ms. Hearn's death outweighs their probative value.

■ "Evidence is cumulative when the fact is 'fully and properly proved by other testimony', so as to take it out of the area of serious dispute." *State v. Ralls*, 583 S.W.2d 289, 292 (Mo.App.1979). According

---

**4.** The *King* court noted that the two exceptions are separate and distinct as defined and not necessarily coordinate but did not decide whether they constituted separate and distinct exceptions. In certain fact situations, the two exceptions may be said to become intertwined and made coordinate. Or the latter exception can be viewed as merely a more refined and explicit statement of the "common scheme or plan exception." 588 S.W.2d at 150 n. 7.

to *State v. Tompkins*, 277 S.W.2d 587, 591 (Mo.1955), the determination of the admissibility of cumulative evidence is within the sound discretion of the trial judge with relevance as the main criterion. The same test applies to the introduction of potentially prejudicial or inflammatory evidence. *State v. Berry, supra*, 609 S.W.2d at 954; *State v. McCabe*, 512 S.W.2d 442, 444 (Mo. App.1974).

■ Evidence should not be rejected as cumulative where it goes to the heart of the matter in controversy. *State v. Smith*, 631 S.W.2d 353, 359 (Mo.App.1982). Moreover, the number of witnesses who may be permitted to testify to a single point rests within the trial court's discretion.

■ On the facts before us, we cannot say that the trial court abused its discretion by permitting five witnesses to testify to the shooting of Roberta Loy Hearn. One witness, Harland Taft, saw the defendant shoot Michelle Marion and then Ms. Hearn. All five witnesses testified to events which bore on an integral part of the offense for which defendant was then on trial. Their testimony was admitted primarily to determine a material issue in controversy—the defendant's intent. Finally, because identity was not in issue, the court limited the testimony to the bare facts surrounding Ms. Hearn's death to avoid the prejudicial impact that detailed accounts of the substantial bloodshed and carnage might have had. *Cf. State v. Richardson*, 515 S.W.2d 557, 560 (Mo.1974) (en banc); *State v. Engberg*, 376 S.W.2d 150, 157–58 (Mo.1964).

### IV.

Defendant next claims that the trial court erred in permitting the state to cross-examine Dr. Mandracchia and Dr. Hornstra about whether the defendant suffered from a mental disease or defect excluding responsibility for his criminal conduct. The

defendant had asserted the mental defense of diminished capacity, having abandoned the defense of mental disease or defect excluding responsibility. He argues, therefore, that the cross-examination improperly permitted the jury to infer that the absence of mental disease or defect excluding responsibility negated the defense of diminished capacity.

■ The defendant claims that by reason of some impairment of his mental faculties resulting from his troubled childhood and the breakup of his romance he did not possess the state of mind required for first degree assault. Whereas, at trial he did not assert that he had a mental disease or defect excluding responsibility for his conduct, he did assert the doctrine of diminished capacity, which by definition depends upon the existence of a mental disease or defect. § 552.030.3(1).[5] Therefore, he opened the door to cross-examination on the existence of a mental disease or defect.

In *State v. Weatherspoon, supra*, 716 S.W.2d at 384, we relied on *State v. Anderson*, 515 S.W.2d 534, 540 (Mo.1974) (en banc), to explain the doctrine of diminished capacity as contemplated by the statute. In *Weatherspoon*, Judge Turnage wrote that *Anderson* had noted that the term "diminished" or "partial responsibility" is somewhat misleading.

Actually the term refers to the fact that a person may not be suffering from a mental disease or defect to the extent that it would exclude responsibility for the crime entirely but as a result of such disease or defect the person might not be capable of forming the requisite intent to commit a certain crime. The holding of *Anderson* is that a defense of incapacity to form a specific intent must be based on the existence of a mental disease or defect.

The actual purpose of evidence of diminished capacity "is to establish, by negating the

---

5. According to § 552.030.3, "[e]vidence that the defendant did or did not suffer from a mental disease or defect shall be admissible

　(1) To prove that defendant did or did not have a state of mind which is an element of the offense...."

*Cf.* MAI–CR2d 3.74 (Mo.Bar 1979) (required-if-requested instruction on diminished mental capacity).

requisite intent, that in fact a lesser degree of the offense was committed." *Anderson*, 515 S.W.2d at 540, quoting Annot. 22 A.L.R.3d 1228, 1238 (1968).

## V.

The defendant challenges the semantics of the mental state described in jury instructions number 7 and number 9, which both track MAI–CR2d 3.74, the required-if-requested instruction on diminished capacity. Instruction number 7 refers to the offense of assault in the first degree:

> Evidence that the defendant had or did not have a mental disease or defect may be considered by you in determining whether the defendant had or did not have the state of mind required of assault in the first degree and set out in Instruction No. 5 as an element of that offense.

> If, after considering all of the evidence, including evidence that the defendant did or did not have a mental disease or defect, you find and believe from the evidence that the defendant engaged in the conduct submitted in Instruction No. 5 but have reasonable doubt *that he attempted to kill or cause serious physical injury* to Michelle Marion by shooting her, then you must find the defendant not guilty of the offense of assault in the first degree as submitted in Instruction No. 5. [Emphasis added.]

Instruction number 9 refers to the mental state for the offense of assault in the second degree in the same terms.

 The defendant complains that the description of the mental state—"that he attempted to kill or cause serious physical injury"—insufficiently impresses upon the jury the necessity of a finding of specific intent. The defendant claims that the trial court erred in refusing alternative instructions "B" and "C" which replace that language with the words "that he acted with the intent to attempt to kill or cause serious physical injury."

The alternative suggested by the defendant, however—"that he acted with the intent to attempt to kill or cause serious

physical injury"—adds nothing. Specific intent is implicit in attempt. *See State v. Gonzales*, 652 S.W.2d 719, 722 (Mo.App. 1983). Moreover, the language incorporated in the given jury instructions is consonant with the statutory language defining those offenses. § 565.050.1(2) and § 565.060.1(3).

## VI.

 Finally, the defendant attempts to circumvent the holding of the United States Supreme Court of *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), that legislatively intended cumulative punishment does not violate the Fifth Amendment Double Jeopardy clause.

The defendant claims that the trial court erred by giving jury instruction number 13, the verdict director for armed criminal action, in addition to the verdict director for first degree assault. The first degree assault statute contains its own enhancement provision: "Assault in the first degree is a class B felony unless committed by means of a deadly weapon or dangerous instrument in which case it is a class A felony." § 565.050.2. Defendant argues that instructing the jury on armed criminal action amounted to double enhancement of punishment for the same crime in violation of double jeopardy principles. The armed criminal action statute, § 571.015.1, provides:

> Except as provided in subsection 4 of this section, any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action and, upon conviction, shall be punished by imprisonment by the division of corrections for a term of not less than three years. The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon. No person convicted under this subsection shall be eligible for parole, probation, conditional

release or suspended imposition or execution of sentence for a period of three calendar years.

The Eastern District of this court addressed this precise question in *State v. Henderson*, 698 S.W.2d 596, 598–99 (Mo. App.1985). Analyzing the question in terms of legislative intent as directed by the United States Supreme Court in *Missouri v. Hunter, supra,* and by the Supreme Court of Missouri in *State v. Cornman*, 695 S.W.2d 443 (Mo.1985) (en banc), the *Henderson* court wrote:

> In the present case the Missouri legislature's intent is well defined in that armed criminal action and the underlying felony with a deadly weapon are now considered only as a matter of intended and extended punishment and not as a violation of the constitutional limits of the Fifth Amendment against "two crimes."

698 S.W.2d at 599.

Defendant suggests that the present case presents a different aspect of the debate concerning the armed criminal action statute. Relying upon *State v. Harris*, 337 Mo. 1052, 87 S.W.2d 1026, 1028–30 (1935), he argues that when two statutes deal with the same subject matter, one in a general way and the other in a specific way, the more specific should be given effect. On this theory, the Supreme Court conceded error in the assessment of the armed criminal action punishment in an armed robbery case. *Id.,* 87 S.W.2d at 1030; *see also State v. Carter*, 443 S.W.2d 176, 178 (Mo. 1969).

The rule of statutory construction applied in *Harris* and later in *Carter* comes into play, however, only when the statutes are inconsistent with and repugnant to each other. *Harris*, 87 S.W.2d at 1029.

The text of the armed criminal action statute in effect at the time of the *Harris* decision does not contain the unequivocal statement of legislative intent contained in the present statute.[6] In the present case, § 571.015.1 makes clear beyond argument the legislature's intent that in cases in which the defendant is found to have used a dangerous instrument or a deadly weapon he shall be subject to the additional punishment.

For the reasons stated above, we affirm the judgment of the trial court.

All concur.

---

6. The statute referred to in *Harris,* 87 S.W.2d at 1028–29, read as follows:

> If any person shall be convicted of committing a felony, or attempting to commit a felony, while armed with a pistol or any deadly weapon the punishment elsewhere prescribed for said offense in the statutes and laws of the state of Missouri for the felony of which he is convicted shall be increased by the trial judge by imprisonment in the state penitentiary for two years. Upon a second conviction for a felony so committed such period of imprisonment shall be increased by ten years; and upon a third conviction for a felony so committed such period of imprisonment shall be increased by fifteen years. Upon a fourth or subsequent conviction for a felony so committed the person so convicted shall be imprisoned for life.

§ 4428 R.S.Mo. (1929). The same text reappeared in later revisions, including § 556.140 R.S.Mo. (1969), the statute in effect at the time of the *Carter* decision, *supra,* 443 S.W.2d 176.