**STATE of Missouri, Respondent,**

v.

**Alfred John SUPINSKI, Appellant.**

**No. WD 41116.**

Missouri Court of Appeals,
Western District.

July 25, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 31, 1989.

C. Clifford Schwartz, Clayton, for appellant.

William L. Webster, Atty. Gen., William J. Swift, Asst. Atty. Gen., Jefferson City, for respondent.

Before GAITAN, P.J., and
MANFORD and ULRICH, JJ.

GAITAN, Presiding Judge.

Appellant, Alfred John Supinski, was charged by information on March 29, 1988, in Callaway County. The case was tried in Boone County following appellant's motion for a change of venue.

Appellant was charged as a prior and persistent offender on five counts: Count I—receiving stolen property under section 570.080, RSMo 1986, for the parts of a 1975 Ford truck on or about November 13, 1986; Count II—receiving stolen property for the parts of a 1984 Chevrolet truck; Count III—receiving stolen property for a closed U–Haul trailer; Count IV—receiving stolen

property for a 1979 King thirty-foot horse trailer; and Count V—possession of a vehicle with altered identification numbers under section 301.390, RSMo 1986, for a 1979 King thirty-foot horse trailer. Prior to trial, Count IV was declared nolle prosequi. Appellant was convicted of the remaining counts. He was sentenced on each count to seven years imprisonment with the sentences to run concurrently.

On November 13, 1986, Sheriff Harry Lee was in the Readsville area of Callaway County accompanied by Investigator Payne. Payne had received a phone call about a possible stolen U–Haul trailer at a residence on County Road 155. Sheriff Lee and Investigator Payne went around to the back on the north side of the house and knocked on the door. There was no response. They went back to their vehicle and backed onto the road to head east. When they got to the east end of the house, there was a metal shed open to the south facing the County Road. They stopped because Sheriff Lee stated that he could see into the open end of this metal shed and could see what appeared to be a U–Haul trailer sitting in the back of the shed. The officers got out of the patrol car and crossed a fence, and walked over another fence. Sheriff Lee then observed under a tarp the front frame of a pickup truck. There were some very large holes in the tarp and he could see that the dash had been partially pulled back and the vehicle identification number (VIN) tag was there on that portion of the dash. He wrote the number down and went back to the patrol car and got on the radio and had the number checked to determine if the truck had been reported stolen. A 1984 Chevrolet pickup bearing that VIN had been reported stolen. The officers then went to the prosecuting attorney's office, filled out and signed an affidavit requesting a search warrant.

Sheriff Lee testified that he had executed a search warrant on the property of appellant, a farm in Callaway County, on November 13, 1986. There, he seized parts of a 1975 Ford truck, parts of a 1984 Chevrolet truck, a closed U–Haul trailer, and a 1979 King horse trailer. He identified the items seized from the photographs and utilized an aerial photo to describe the property. On January 5, 1987, Sheriff Lee executed a second search authorized by a warrant. The return and inventory from that search included two halves of a frame and truck tailgate.

The first point raised on appeal is that the first search warrant was deficient in that it was based on illegal trespass and not based on probable cause; that the trial court erred in overruling appellant's objections and the motion to suppress evidence obtained. However, appellant's theory that the search warrant was the poisonous fruit of an illegal trespass was not presented in its motion to suppress, at trial or in the motion for a new trial. The failure to raise a particular ground for suppressing evidence in the trial court or in the motion for a new trial results in the matter not being preserved for appellate review. *State v. Buss*, 768 S.W.2d 197, 200 (Mo.App.1989). This issue is only reviewable under the plain error doctrine. Rule 29.12(b). Under the plain error standard of review, "the plain error complained of must impact so substantially upon the rights of the defendant that manifest injustice or a miscarriage of justice will result if left uncorrected." *State v. Driscoll*, 711 S.W.2d 512, 515 (Mo. banc 1986). The burden of demonstrating that the action of the trial court resulted in manifest injustice or a miscarriage of justice is given to the defendant. *State v. Groves*, 646 S.W.2d 82, 83 (Mo. banc 1983). The appellant has not met that burden here.

In the case at bar, we believe that the open fields doctrine, which allows the search of an area by police officers without a warrant, is applicable, and thus there is no violation of defendant's Fourth Amendment rights. *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The open fields doctrine applies to areas not within the curtilage of the home. *Id.* at 300, 107 S.Ct. at 1139. In *Dunn*, the Court stated that there are four factors to be considered in determining the extent of a home's curtilage: (1) the proximity of the area claimed to be the curtilage to the

home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passers-by. *Id.* at 300, 107 S.Ct. at 1139. These factors bear upon the central question of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'Umbrella' of Fourth Amendment protection." *Id.*

Missouri courts have recognized the applicability of the open fields doctrine. *State v. Seaton,* 679 S.W.2d 908, 909 (Mo. App.1984); and *State v. McBurney,* 690 S.W.2d 834, 835 (Mo.App.1985). The doctrine is applicable in the case at bar and we believe that the shed was not within the curtilage of the home.

First, there was evidence presented at trial that the open shed was between 45 and 50 yards from County Road 155. The distance between the house and the location of the pickup truck behind the shed support the inference that the shed and the items surrounding it should not be regarded as an adjunct of the house. Second, the shed area was not included within an enclosure surrounding the house.

Additionally, there was no evidence presented that would imply that the shed was being used or associated with activities and privacies of domestic life as to be regarded as part of appellant's home. And finally, no steps had been taken to prevent the activities around the shed from observation by passers-by. The officers were able to observe the U-haul trailer in the shed from the road. They were also readily able to scale the fences.

Therefore, we find that the search of the shed was properly obtained through an open field examination. The trial court was correct in overruling appellant's motion to suppress the evidence obtained by the subsequent warrant.

Appellant's second point on appeal is that the trial court prejudicially erred in allowing the prosecutor to introduce evidence of the character of appellant when character was not placed in issue. We disagree.

It is recognized that the State may cross-examine a witness about a defendant's prior criminal history in order to test both the witness' familiarity with the defendant's reputation and the stringency of the standard under which the reputation was earned when the witness has offered evidence pertaining to the defendant's good reputation. *State v. Byrd,* 676 S.W.2d 494, 505 (Mo. banc 1984). Further, when a witness testifies to his own opinion of a defendant's character the prosecutor may challenge the legitimacy of the basis for the opinion by inquiring whether the witness is cognizant of pertinent bad acts of the defendant. *Id.*

In the case at bar, the prosecution presented witness John Griffin, a Missouri Department of Conservation agent from Callaway County. He was called in order to establish that appellant had been seen on the property in question by someone other than a witness named Rebecca Ann Iffrig. Griffin's testimony was important because Iffrig's credibility was in question due to ongoing hostilities with appellant. During cross-examination, Griffin was asked the following:

Q. Do you like him?

A. Al, yeah.

Q. Is he a good guy?

A. He helps me a lot.

When appellant's counsel concluded his cross-examination of Griffin, the prosecutor requested a bench conference. During that conference, he indicated that he intended to examine Griffin about appellant's prior convictions because appellant's counsel had injected the issue of good character. The prosecutor proceeded to inquire about Griffin's familiarity with appellant's criminal history. After inquiring about the specific charges and their disposition, the prosecutor asked Griffin if his opinion of appellant would have changed had he known about appellant's criminal history. Griffin responded, "no". Having injected the issue of appellant's good character, the subsequent inquiry of Griffin was permissible.

**262**

■ The second portion of appellant's allegation regarding the admission of evidence of other crimes involves an inquiry directed to Violet Pasley, a witness called during appellant's case. Appellant asserts the inquiries regarding other crimes was improper because appellant had not injected the issue of his good character.

Respondent's cross-examination of Pasley included the following:

Q. Do you know if Mr. Supinski ever had any stolen property?

A. On my place?

Q. Anywhere?

A. I don't know anything about Mr. Supinski's business. He's been in the family 31 years and I have never asked him none of this business today. I don't consider his business as mine. And mine is mine too. [sic]

Q. Are you aware of anytime when he had stolen property in the past 30 or 31 years?

A. No, not that I know of. Like I said, I had been to [the] Supinski house too many times as long as they have been married. I do not. [sic]

Q. You haven't been to their homes?

A. Not very many times. I don't bother. I stay at home and tend to my own business, don't bother with any neighbors and nobody.

Q. Do you remember when he was living over in Granite City?

A. I remember he was living in Granite City, yes.

Q. 1963?

A. Yeah.

Q. You remember a couple of stolen fishing rods?

MR. SCHWARTZ: May we approach the bench?

Appellant's objection to respondent's inquiry was sustained and the jury was admonished, however, his request for a mistrial was overruled. While sustaining appellant's objection, the trial court noted the following:

THE COURT: The objection as to the question asked will be sustained. Your request for a mistrial will be denied be-cause the Court's feeling that the record will reveal you sat right through and *saw it was coming and didn't object to it.* There has been a number of other questions (emphasis added).

It is recognized that appellate courts should not condone sandbagging. *See State v. Taylor,* 726 S.W.2d 335, 338 (Mo. banc 1987) (defense counsel may not approve of the trial court's decision not to give an instruction and then assert on appeal it was error to fail to give the instruction); and *State v. Barrett,* 744 S.W.2d 856, 860 (Mo.App.1988) (defendant would not be heard to complain respondent failed to prove the validity of the revocation of his license when he had stipulated his license was revoked). The trial court indicated it believed appellant anticipated the prosecutor's questions but elected to not object to those questions. This statement is supported by the fact that prior to the questioning about the stolen fishing rods the prosecutor had inquired whether Pasley was familiar with appellant ever having any stolen property anywhere. The trial court did not abuse its discretion because the record supports its belief appellant was sandbagging. Therefore, the trial court did not abuse its discretion when it denied a mistrial.

■ Finally, appellant alleges that his objections and request for a mistrial should have been granted when the prosecutor inquired about appellant's prior criminal history during his cross-examination of appellant's wife, Patricia Supinski. Again, under *Byrd,* it is proper to inquire whether a witness who testifies favorably regarding a defendant's character is familiar with the defendant's prior acts of misconduct. *Byrd,* 676 S.W.2d at 505.

The concluding portion of appellant's direct examination of Patricia Supinski included the following:

Q. Did your husband buy or receive any stolen property?

A. No, sir.

Q. From. I'm talking about, you know, 1985 or '86?

A. No, sir.

Q. Every buy a truck or truck part in 1985 or '86 and take it to the farm?

A. No. My husband wouldn't do that.

Q. What?

A. My husband wouldn't do that.

MR. SCHWARTZ: I don't have anything further.

The prosecutor proceeded to inquire whether Mrs. Supinski was familiar with appellant possessing two rods and reels while the couple lived in Granite City in 1963.

After the prosecutor pursued other matters, he began to inquire whether Patricia had seen any of the items on the property which gave rise to the charges at issue. At that point, the prosecutor resumed his inquiry about appellant's prior criminal history. Immediately after this questioning, the prosecutor inquired as follows:

Q. Knowing all those things, do you still say he wouldn't do such a thing as receive or possess stolen property?

A. I do say it. Absolutely.

Appellant complains that the prosecutor should not have been allowed to conduct the noted inquiries because he did not inject the issue of his good character and alternatively even if he did the latter portion of the prosecutor's examination was repetitious and improper. The concluding portion of appellant's direct examination of Patricia Supinski injected the issue of appellant's good character. It was therefore proper for the prosecutor to inquire on cross-examination as to Mrs. Supinski's familiarity with appellant's character and in particular prior bad acts.

The third point raised by appellant is that he was convicted by circumstantial evidence of retention of stolen property in that only constructive possession of those stolen items was shown. As to Counts I through III, appellant contends that respondent failed to establish that appellant possessed the items or had knowledge that the items were in fact stolen and intended to deprive the rightful owners of those items. He also contends that there was no evidence of receipt of those items. As to Count IV, appellant asserts that respon-dent failed to establish that appellant possessed the horse trailer. Particularly, he asserts that respondent failed to demonstrate that appellant knowingly had possession of the horse trailer and knew the manufacturer's identification number was removed.

All of appellant's contentions relate to the sufficiency of the evidence. In reviewing a sufficiency question, this Court must "view the evidence in the light most favorable to the State, including all reasonable inferences to be drawn from the evidence, and disregard contrary evidence and inferences." *State v. Davis,* 753 S.W.2d 25, 26 (Mo.App.1988).

■ In regard to Counts I through III, the evidence presented at trial established that appellant possessed the land on which the stolen property was found. There was a deed from Robert and Violet Pasley to appellant and his wife. Ownership was also established by the fact that the deed from the Pasleys to the appellant was recorded and no subsequent recorded conveyances existed in the records. Additionally, appellant was listed as the owner of the farm property by the County Assessor and tax statements for 1985 and 1986 were mailed to appellant at his St. Louis address. All of the above evidence establish that appellant owned the property, and the fact that the items at issue were found on that property establishes he possessed those items.

There was testimony by Becky Iffrig that she saw appellant on the farm property almost every weekend during the months prior to November 1986. She testified that she also observed appellant standing near the U–Haul trailer when its color was being changed from its characteristic orange and aluminum to a rusty brown. Additionally, John Griffin, the conservation agent reported seeing appellant on the land in 1986 where the stolen items were found. The reasonable inference from Ms. Iffrig's testimony demonstrates that appellant in fact possessed the stolen items.

■ Respondent is not required to produce direct evidence that a defendant knew

the items in question were stolen in the prosecution for receiving stolen goods. *State v. Rogers,* 660 S.W.2d 230, 232 (Mo. App.1983). Further, the State may demonstrate that the defendant knew the materials were stolen through evidence of the method chosen to dispose of the property. *State v. Norman,* 586 S.W.2d 45, 47 (Mo. App.1979).

■ A witness for the prosecution, Wally Eaton, who was employed by Mid–Missouri Auto Salvage as a wrecker driver and mechanic, testified that the manner in which the Chevrolet truck was dismantled was consistent with an attempt to sell it as salvage. Portions of both a 1975 Ford truck and a 9184 Chevrolet were found on appellant's property. In *State v. Wakefield,* 712 S.W.2d 442, 443 (Mo.App.1986), the court stated that the defendant's belief or knowledge that vehicles he possessed at his "chop shop" were stolen could be inferred from the facts and circumstances. "Chop shop" operations are characterized by the conversion of vehicles into salvage materials. *See, e.g., State v. Cummings,* 714 S.W.2d 877, 878 (Mo.App.1986). From the dismantling of the trucks it can be inferred that appellant was operating a "chop shop" and had knowledge that the vehicles were stolen. Furthermore, the dismantling of the trucks was evidence that appellant intended to deprive the rightful owners of their properties.

The U–Haul trailer was repainted from its characteristic orange color to a rusty brown. The president of U–Haul of Eastern Missouri testified that all of the details of the U–Haul, including the emblem on its side and the numbers all around the unit, were blocked out. These alterations suggest that preparations were being made to dispose of the U–Haul trailer. From these preparatory steps, it can be reasonably inferred that appellant knew the U–Haul trailer was stolen. Likewise, the alterations demonstrate an intent to deprive U–Haul of its property.

■ The final component of appellant's challenge to Counts I through III is focused on the alleged failure to demonstrate receipt of stolen property. Section 570.080, RSMo 1986, however, contemplates single party transactions because of the words "retains" or "disposes." In *State v. Williams,* 635 S.W.2d 55, 58 (Mo.App. 1982), this Court rejected the same attack that appellant now asserts. The instructions for Counts I through IV require the jury to find that appellant *retained* the property while knowing or believing it was stolen and that he *retained* the property for the purpose of *disposing* of it so as to make recovery unlikely. It is not necessary to prove receipt of stolen goods.

■ In regard to Count V, appellant alleges that respondent failed to establish that he knowingly had custody or possession of the horse trailer and knew the manufacturer's number was removed. Section 301.390.1, RSMo 1986, requires a defendant to knowingly have custody or possession of a vehicle in which the original manufacturer's number has been destroyed, removed, covered, altered or defaced. Respondent must demonstrate that the defendant knew the manufacturer's number was altered or defaced. *State v. Sollars,* 747 S.W.2d 134, 136 (Mo. banc 1989).

■ For the reason discussed above in regard to Counts I through III, it has also been demonstrated that appellant possessed the horse trailer. The only remaining issue is whether appellant knew the manufacturer's number was removed. "Chop shops" commonly remove identification numbers from stolen vehicles. *See Cummings,* 714 S.W.2d at 884–85. Because it can be inferred from the evidence that appellant operated a "chop shop" and such operations commonly remove vehicle identification numbers, the evidence established that appellant was aware that the identification number on the horse trailer was removed. Therefore, appellant's third point on appeal is without merit.

■ As his fourth point, appellant contends that Instruction 6, 7 and 9 were all materially defective. Under the concurrent sentence doctrine, the Court "may pass on the validity of less than all counts in a multi-count conviction if a ruling in appel-

lant's favor as to the challenged counts would not reduce the penalty imposed as to the valid conviction." *State v. Davis*, 624 S.W.2d 72, 77 (Mo.App.1981).

In the case at bar, appellant does not question his conviction in Count III for receiving stolen property of the U–Haul trailer. On all counts, appellant received a seven-year sentence to be served concurrently. The consideration of appellant's fourth point would not reduce the penalty imposed. Therefore, we will not consider appellant's fourth point.

Appellant's fifth point is that the trial court erred in allowing Sheriff Lee to testify as to the value of the stolen parts in that he was not an expert and not properly qualified to so testify. We disagree.

■ The test of expert qualification is whether the individual has knowledge from education or experience which will aid the trier of fact. *State v. Mallett*, 732 S.W.2d 527, 537 (Mo. banc 1987). The trial court is committed with the sound discretion to determine whether an individual is qualified as an expert. *Id.*

■ In the case at bar, Sheriff Lee testified that prior to working in law enforcement he worked at an automobile parts store, a Ford garage and a service station. Sheriff Lee worked in auto mechanics for fifteen to eighteen years before entering law enforcement. He testified that he had worked on several hundred vehicles during a thirty-five to forty year period. During the last few years, Sheriff Lee stated that he had worked around automobile garages and had experience in rebuilding several vehicles that were salvaged. Further, he stated that he had purchased damaged vehicles and parts of vehicles from salvage yards. From this above-stated testimony, we find that the trial court did not abuse its discretion in its determination that Sheriff Lee was well-acquainted with the value of both new and salvage parts, and therefore he had sufficient expertise in this area to express his opinion as an expert as to the value of the items found on appellant's property.

The sixth point raised by appellant is that the trial court erred in failing to strike venireman Garrett for cause in that said failure caused appellant to lose the benefit of a full panel from which to make his pre-emptive challenges. We disagree.

■ The trial court has wide discretion in determining the qualifications of a prospective juror and its actions will only be disturbed on appeal if the record demonstrates a manifest abuse of discretion accompanied by a reasonable probability of injury to the defendant. *State v. Weatherspoon*, 728 S.W.2d 267, 271 (Mo.App.1987). This Court noted in *Weatherspoon* that "the trial court is in a far better position to determine a challenge for cause than an appellate court, [and] all doubt should be resolved in favor of the trial court's finding." *Id.* Lastly, a crime victim is not disqualified unless the "experience interferes with or prevents him from basing his verdict solely on the evidence and giving both parties a fair trial." *State v. Henderson*, 708 S.W.2d 206, 208 (Mo.App. 1986).

The relevant portion of respondent's voir dire of Garrett was the following:

MR. STERNER: Now, let's take the second row. Anyone down here?

VENIREMAN GARRETT: Criminal case about ten years ago.

MR. STERNER: Witness for State or the defense?

VENIREMAN GARRETT: Well, I had some property stolen from me.

MR. STERNER: So, you were a witness in the prosecution of that case I take it. Anything about that experience being the State's witness, crime victim, that would cause you a problem?

VENIREMAN GARRETT: No.

MR. STERNER: I sort of combined my questions. Let me go back to the crime victim part of it. Does the fact that you were a crime victim, having something stolen from you, does that cause you to hold it against anyone who's charged with a crime?

VENIREMAN GARRETT: I don't think so.

MR. STERNER: Okay. You'd be able to give Mr. Supinski a fair trial today, you think?

VENIREMAN GARRETT: Uh-huh.

When respondent inquired whether Garrett would base a verdict on matters he knew outside of the courtroom or solely on the testimony presented in the courtroom, Garrett indicated his decision would be based solely on matters presented at trial.

Appellant's examination of Garrett, in pertinent part, included the following:

MR. SCHWARTZ: Do any of you gentlemen think Alfred Supinski did anything wrong about two years ago? Mrs. Bradshaw?

VENIREMAN BRADSHAW: I don't know.

MR. SCHWARTZ: Mr. Garrett, do you think he might have done this?

VENIREMAN GARRETT: I don't know.

During respondent's inquiry as to whether Garrett's status as a crime victim would influence him, Garrett indicated he could provide appellant with a fair trial. There is nothing in the record to suggest that Garrett's experience would interfere with or prevent him from basing his verdict solely on the evidence and furnishing appellant with a fair trial. The trial court did not err in refusing to strike Garrett solely because of his status as a prior crime victim.

Appellant also claims that Garrett's response whether he believed appellant was guilty was equivocal. The record indicates that Garrett responded to this inquiry by stating "I don't know." The fact that Garrett indicated he did not know whether appellant was guilty in no way is equivocal, but instead demonstrates he was not predisposed to favor either party and would premise his decision exclusively on evidence presented at trial. Moreover, the record demonstrates when respondent inquired whether Garrett's decision would be premised on matters he might be aware of prior to trial or exclusively on matters he heard at trial that Garrett indicated his decision would be confined to evidence represented at trial. Garrett's responses were not equivocal. Therefore, appellant's sixth point is without merit.

The final point raised by appellant is that the trial court erred in failing to declare a mistrial during voir dire when the prosecutor inquired whether the members of the panel were in any way aware that appellant allegedly possessed stolen vehicles. We again disagree.

■ The declaration of a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances. *State v. Young*, 701 S.W.2d 429, 434 (Mo. banc 1985). The rationale for this rule is that the trial court has observed the incident which gave rise to the request and is in a better position to evaluate the prejudicial consequences. *Id.* Appellate review of the refusal to grant a mistrial is limited to determining whether the trial court abused its discretion. *Id.*

In the case at bar, respondent's voir dire included the following:

MR. STERNER: Okay. The three of you particularly I want to address this question to.

Have you heard anything about this case, Mr. Supinski out by Williamsburg, Readsville, allegedly having some stolen vehicles? Have any of the others of you heard anything about it? It would be less likely, but it's possible. Okay. You're shaking your head.

MR. SCHWARTZ: I'll object to that. There's never been any insinuation there's ever been any stolen vehicles except for this charge almost two years ago, and I think that's also sort of blanket.

THE COURT: Objection will be sustained. Rephrase your question and move on.

MR. SCHWARTZ: Could we approach the Bench, Judge?

Thereupon, the following was held at the Bench out of the hearing of the jury panel:

MR. SCHWARTZ: Your honor, at this time I'd asked for a mistrial for the reason that I think it was counsel's word that it's possible that they could have heard that Mr. Supinski had some stolen vehicles on his property. That's of course the ultimate issue of fact that the

jury has to decide in this case and I think suggesting or insinuating in any degree without evidence of proof is improper especially in a time like this and I'd asked for a mistrial.

THE COURT: Request for a mistrial will be denied. Please proceed.

Thereupon, the following was held in the presence and hearing of the jury panel:

MR. STERNER: So, is it my understanding none of you have heard anything about this case then?

The prosecutor's subsequent voir dire included the following:

MR. STERNER: Mr. Butler, you said that you hadn't heard anything about his case. If you're selected to serve as a juror in this case will you base your verdict on something you knew outside the courtroom or on the evidence and the testimony that you see and hear in the courtroom?

MR. BUTLERT [sic]: On this evidence that I hear in the courtroom.

Appellant's voir dire included the following:

MR. SCHWARTZ: Mr. Supinski is not charged with anything. I assume for the moment that statement about there is a possibility you might have heard Mr. Supinski at any time in his life did anything wrong is not, is eradicated. That's an unfair shot. Or there is a different name for it[.]

MR. STERNER: May we approach the Bench?

THE COURT: You may.

Thereupon, the following was held at the Bench out of the hearing of the jury panel:

\* \* \* \* \* \*

THE COURT: Mr. Schwartz, you're getting awful close to summation. The objection will be sustained.

MR. SCHWARTZ: I didn't bring it up. He did. He raised it.

THE COURT: That's not the way I understood his question to be originally.

The decision of this Court in *State v. Galbraith*, 723 S.W.2d 55 (Mo.App.1986), is instructive on the present challenge. In *Galbraith*, it was alleged that the trial court erred in allowing the prosecutor to describe the crime alleged during voir dire. In rejecting Galbraith's claim this Court found that "[t]he prosecutor's description of the alleged crime to the extent necessary to determine whether any members of the venire had been influenced by pretrial media coverage of the case was entirely proper." *Id.* at 63.

In the case at bar, the portion of the record reproduced indicates the prosecutor was attempting to ascertain whether members of the venire were in any way acquainted with the charges brought against appellant. When the prosecutor made that inquiry he referred to the fact that it was "alleged" that appellant possessed stolen vehicles. In *Galbraith* it was proper for the prosecutor to inquire whether members of the venire were in any way acquainted with the allegations involved and while referring to those matters they were described as "alleged." The same is true here.

The record does not support appellant's assertions that the prosecutor attempted to refer to prior acts of stealing committed by appellant. Instead, the record demonstrates that the prosecutor was merely attempting to ascertain whether the members of the venire were acquainted with the facts of the charges pending in this matter. The questioning directed at Venireman Butler indicates the prosecutor's intent was to ensure that the members of the venire could decide this case based exclusively on the facts presented at trial and not rely on matters which they may have acquired through outside sources. It is also noteworthy the trial court indicated it did not perceive the prosecutor's questions to be directed at any prior acts of misconduct other than those at issue here. Therefore, we conclude that no abuse of discretion occurred.

The judgment of the trial court is affirmed.

All concur.